THE GEORGE JONAS GLASS COMPANY

*v.*

THE GLASS BOTTLE BLOWERS' ASSOCIATION OF UNITED STATES AND CANADA, WILLIAM M. DOUGHTY et al.

[Submitted May 6th, 1907. Decided May 18th, 1907.]

1. An organized attempt to induce the public to refrain from purchasing the products of a manufacturer, and to deprive him of a part of his trade market, commonly called "boycotting," having for its object the compelling of the manufacturer to unionize his business and the submission of its conduct to the regulations of a labor union, is an irreparable injury to his property, the continuance of which a court of equity will enjoin.

2. A combination or agreement to picket a manufacturing plant for the purpose of interfering with the free flow of labor to an employer, to whom labor is a necessity for the carrying on of his business, which, if successful, will prevent him from obtaining the means of pursuing a lawful occupation, and the sole purpose of which is to compel him to comply with the demands of an antagonistic power, is a conspiracy against the property rights of the employer, subjecting his property to an irreparable injury, and all parties to such compact, actors as well as abettors, will be restrained from establishing and maintaining such picket service.

3. A labor organization seeking to compel a manufacturer to unionize his plant is not such a competitor in the labor market as to justify it in

enticing employes to leave the service of their master, or to induce persons seeking employment with him from so doing, when the enticer does not employ labor. The competition which the law upholds must be honest competition, and not a malicious attempt to injure another.

On bill for injunction. Final hearing on pleadings and proofs.

*Messrs. Hampton & Fithian* and *Mr. John W. Harding,* for the complainant.

*Mr. Louis H. Miller* and *Mr. John W. Wescott,* for the defendants.

BERGEN, V. C.

This controversy arises over an attempt of the principal defendant, the Glass Bottle Blowers' Association of the United States and Canada, and its officers, who are also defendants, to compel the complainant to "unionize its factory." The association is not incorporated, but a voluntary society made up of a number of persons who act as its officers, and control, through the medium of what is described as "local unions," a certain class of workers in glass-blowing factories who are willing to join the organization. The executive officers annually confer with the representatives of such factories as consent to be unionized, and together they fix the rate of wages to be paid and the general conduct of the manufacturers' business for the coming season, and the result of this conference is communicated to the local unions, who are supposed to comply therewith. It appears in this case that the association had, in 1901, succeeded in unionizing and bringing under its control the management of all factories in New Jersey doing a business similar to that of complainant, save that of the complainant and one other which is managed by the persons interested in complainant's business.

The complainant's factory since 1896 had been a subject of annoyance and dissatisfaction to the association, because Mr. Jonas, its president and principal owner, had persistently refused to subject his business to the management and control of this self-constituted monitor, and after an attempt to boycott

the business of the complainant had failed to drive it into the union, a strike was declared at the works of the complainant located at Minotola, in the county of Atlantic in this state, on the 9th day of April, 1902, whereupon the employes of the complainant to the number of, approximately, three hundred, left the employment of the complainant, leased a lot of land in the immediate neighborhood of the factory and procured and set up a large tent in which the strikers congregated, which was afterwards replaced, at the expense of the defendant association, by a substantial wooden structure used for the same purpose. While the officers of the association deny that they instigated the strike, they all admit that immediately upon its declaration some of them took the management and direction of the men who were engaged in it. The complainant charges that, by violence, threats and opprobrious epithets, the officers of the association, and the men whose actions they were directing, intimidated persons seeking employment at its factory, and prevented them from doing so; that the strike was the culminating effort of the officers of this association to drive it to the wall, and compel it to submit to their dictation, and further that, although restrained by an order of this court, made in this cause, when the bill of complaint was filed, they have desisted from acts of physical violence, a cordon of pickets guard all the highways leading to the complainant's factory, by whom all persons seeking employment there were, at the time the evidence in this cause was taken, subjected to ridicule, opprobrious epithets, and open or implied threats; that such picketing is a violation of its constitutional right to conduct its business in a legal way according to its own methods, resulting in injury to its business and the destruction of its property.

Before entering upon the consideration of the case, I take occasion to say that it is not intended, by anything that may appear in this opinion, to question the right of proper organization for lawful purposes, nor the right of anyone to peaceably state his side of a controversy, provided it be what it pretends to be, and is done without threats or show of force, or in any manner or under any conditions, which may fairly indicate that a threat is intended either to person or property, yet it is not

necessary that the deterrent force be threatening words; acts are sometimes more effective than words, but words or acts which, taken in connection with the surrounding circumstances, are intended to intimidate, and which naturally would deter an ordinary person from proceeding to obtain work from one entitled to employ him, are not peaceable persuasions, for they interfere with "the right of personal security, the right of personal liberty and the right of private property," the enjoyment and pursuit of which is guaranteed to every citizen by the constitution of the state, and the law of the land.

In 1892 George Jonas established at Minotola a factory for the manufacture of glass bottles, and conducted the business as an individual until 1897, when the complaining company was incorporated under the laws of this state, and the property transferred to it. When the plant was located no village existed, but a considerable tract of land was purchased, and the necessary manufacturing buildings put up, as well as a number of dwelling-houses, which were rented to the employes of the company, so that in April, 1902, the company had invested about $300,000 in land, machinery, merchandise and buildings, forty-seven of the latter being tenant-houses. In the year 1896 one George W. Brannin, a member of the executive committee of the defendant association, called upon Mr. Jonas, at Minotola, and had a conversation with him about unionizing the factory, without any agreement being reached. In 1899 Brannin again visited Jonas, and told him that they expected to unionize the different glass factories in South Jersey, and "they had gotten our men, some of them, to go out with them, and he thought it would be to our best interest to unionize the plant." Brannin made no threats, and his conduct during both interviews appears to have been confined to an attempt to demonstrate to Mr. Jonas that it would be of advantage to the complainant to run its factory under the rules and regulations of the association, one of these rules being that complainant should only employ one apprentice to fifteen journeymen, while nearly all of the men then employed by it were apprentices. Shortly after this, according to the testimony of Mr. Jonas, about twenty of the men employed by the complainant left, and took employment elsewhere, one of them

exhibiting to Mr. Jonas a card, signed by Mr. Hayes, the president of the association. This card, as I gather from the evidence, being a certificate of the association, that the party holding it was a member of the union, and entitled to work in any union shop. The first move made by the association to coerce the complainant into a compliance with its wishes was an attempt to induce the firm of Whittimore Brothers Company, of Boston, Massachusetts, to withdraw its patronage from the complainant. This firm, who were manufacturers of shoe polish and blacking, had entered into a contract with the complainant for the manufacture of bottles for use in their business, amounting to about $35,000, and in October, 1901, the association issued and circulated generally in the United States and Canada a circular letter signed by Dennis A. Hayes, its president, addressed "To our Brethren in the labor movement, Greeting," portions of which read as follows:

"The Glass Bottle Blowers' Association of the United States and Canada request your attention to the following statement:

"For fifteen years we have been fighting non-unionism and company stores in New Jersey. * * * There are two non-union concerns remaining. The principal one is operated by the George Jonas Glass Company. * * * The factories at Minotola are operated almost exclusively on bottles for the Whittimore Brothers Company, Boston, Mass., manufacturers of shoe and leather dressing, and if we could secure the withdrawal of this order we might make terms with the George Jonas Glass Company. We have appealed several times to the Whittimore people, and later Mr. James Duncan, first vice-president of the American Federation of Labor, called on them a number of times in relation to the matter, but his efforts and ours were alike unavailing. The firm ignores our appeal. Thus it has been placed on the unfair list of the A. F. of L., and we hope you will bear this in mind when about to have your shoes blacked, or whenever buying shoe polish or leather dressing of any kind. We would feel under many obligations if you would appoint committees to wait on business men who handle this line of goods, and also write to the Whittimore Brothers Company, No. 237 Albany street, Boston, Mass., asking them to withdraw their patronage from the concern at Minotola. * * * * We want this firm to realize that organized labor is a power, and that its efforts to assist and protect the helpless and oppressed cannot be lightly turned aside."

The response to this circular was prompt and effective, for letters were mailed from all parts of the country to the Whittimore Brothers Company, of which over one hundred and fifty

have been put in evidence, the result being that Whittimore Brothers Company refused to observe their contract with the complainant, which was thus deprived of a market for its goods of great value. One of these letters, written January 3d, 1902, from Canton, Ohio, which reflects the average expression of all, reads in part as follows:

"P. S.—We have a strong union city, and they claim that you buy your bottles from the George Jonas Glass Company, of Minotola, N. J. If such is the case, I must ask that you cancel my spring order, but as you know as well as I (or better), will you please write me a letter to hand over to committee of—labor, &c., &c., see—do not give me away. Say what there is in it. I cannot use your goods while the 'ban' is on. I will not try. Send letter if you wish, to be read in council. I will not use goods unless the ban is raised."

It also appears that after the bill of complaint was filed in this cause the defendant association continued its boycott against the complainant by sending letters to its customers, notifying them that it was known they were having their bottles made at Minotola, and after stating that revelations of the most appalling character had been made regarding the working of children, and that "two mere babies, worked in open defiance of the law by the George Jonas Company, were killed in the most sickening manner," continued "that they had decided to put three men on the road, also to establish a press bureau for the purpose of giving to the public the information necessary to enable them to withhold their patronage," from parties using the product of the complainant. In order to indicate the character of the boycott inaugurated and carried on by the defendant association, the following letter is pertinent:

"*Menard Liniment Company, Boston, Mass.:*
"GENTLEMEN—In re abuse of children by Jonas et al., some time since we wrote you calling attention to your responsibility for wrongs therein complained of. Are we to understand from your silence that you wish us to publish to the world that you endorse and stand for the slaughter of the innocents?                Very truly,                E. A. AGARD."

The evidence in this cause abundantly proves that the defendant association attempted to establish a boycott against the goods manufactured by the complainant, and so far succeeded as to

cause it a serious loss of property, for the sole purpose of compelling the complainant to unionize its factory, or in other words to submit the conduct of its business to the demands of the association. Such conduct has been declared by this court to be unlawful, a conclusion which meets my hearty approval. *Martin* v. *McFall, 65 N. J. Eq. (20 Dick.) 91.*

The next important step taken by the association to accomplish its purpose was the sending of a letter to the complainant signed by Dennis A. Hayes, the president of the association, bearing date March 27th, 1902, in which he states that he has been requested by the workmen of complainant "to seek a conference with you, to so far as possible, correct those grievances and unionize your factory." In ascertaining the real purpose of this letter it must be borne in mind that Hayes testifies that at this time none of the employes of the complainant were members of his association; that he then had no special interest in them, because many of them had taken the places of those who had participated in the strike, and left the complainant in 1899. The only request made in this letter on behalf of the workmen is that they should be conceded such wages and privileges as unionized factories were paying and allowing under an agreement with the association, therefore it is quite apparent that this letter was only another step looking to the compelling of the complainant to submit to the association, for the wages and privileges, the absence of which is described as a grievance, were mere incidents of the control by the association of complainant's business, for once unionized, the other results would follow, and the conclusion is justified that under a pretence of benefiting labor these officers were seeking power and attempting to establish a monopoly that would stifle competition between workmen desiring to labor in that line, for it is not denied that the number of apprentices under union rules is restricted for the purpose of keeping to the minimum the supply of skilled labor.

The complainant refused to unionize its factory, and on April 9th, 1902, about two weeks after this letter was written, over three hundred of complainant's workmen left its employ, and a strike was declared, which has been since maintained under the direction and management of some of the principal officers of

the association, with the avowed object of compelling complainant to unionize.

The present proceeding was instituted by the complainant to have the defendants, among whom are numerous of its former workmen, enjoined from boycotting its business; inducing its employes by threats, intimidation, force, violence or the payment of money to refuse to perform their duties or leave its service, or by like methods preventing those who desire to do so from entering its employment, and also from using indecent and opprobrious epithets to its officers and employes; from collecting singly or in combination with others with the intention of picketing the public highways leading to its factory, for the purpose of inducing laborers not to take employment with it; from gathering at railroad stations at or near complainant's works and inducing, or attempting to induce, persons arriving at such stations seeking employment at complainant's factory from so doing, and generally from bribing or intimidating workmen to refrain from entering complainant's employment, or inducing those who are employed to leave.

The principal officers of the defendant association have been called, and they all deny that they instigated the strike; but such denials have little weight when considered in connection with their previous and subsequent conduct, for it is quite clear from the evidence that months before the strike occurred they had been engaged in an effort to bend complainant to the will of their association, and employed all the resources of a rich, powerful and well-organized society to deprive the complainant of a market for its goods, and to accomplish the destruction of its business in default of its submission to their will, when, failing in such efforts this strike was declared, a strike which the officers of this association are immediately found to be directing and controlling, and in furtherance of which the association for a long period, if not to the present time, has paid the wages not only of the men who left the factory, but of strangers brought from other places to lead and direct the strikers. The first demonstration after the strike was declared was a parade led by the defendant Doughty, the vice-president of the association, preceded by a band of music, and Mr. Hayes, the president of the association,

was so promptly on the ground that the suspicion is justified that he had knowledge of what was coming. The testimony of the witness Edward C. Rush shows that some time prior to this strike meetings of the workmen were held at Vineland, which he attended, and that the defendants Doughty and Launer, another officer of the association, were present at different times and addressed the meetings, advising the men to organize and keep still about it, and that "they would take care of them and pay them good wages if they went out." I am satisfied from the evidence that this strike was promoted by the officers of this association, in pursuance of their conceived scheme to compel the complainant to unionize its factory. I believe that Mr. Hayes told the truth when he testified that he had no interest in the workmen before the strike, because they had taken the places of other strikers, and am satisfied that he used these men as a means to accomplish his long-cherished purpose; that it was a war of conquest, not for the relief of the downtrodden as he now seeks to convince us, and that the officers of this association are as directly responsible for the acts of violence and unlawful conduct of these men as if they had actually participated in each of them. I give little credit to, and have no respect for, men who inaugurate a movement which they know they cannot control, and then seek to excuse themselves because they have advised, as they say, a body of men, many of them ignorant Italians, against the doing of unlawful acts, when common sense and ordinary experience teaches that a body of idle workmen, called together at a common rendezvous, such as this association provided, pay no attention to moral precepts communicated for the purpose of being used as a defence when called upon to respond for the acts of a disorderly mob. If these men had been advised to return to their homes and act as orderly, law-abiding citizens, simply exercising their right to quit work, a different situation would have been presented, but, on the contrary, they were gathered at a place provided by the officers of the defendant association, for no possible reason except to make a show of force, the known effect of which would be to arouse the fears of others desiring to remain at work, or to take the places of those who had left, and whose continued employment would endanger the success of the

result sought to be accomplished. The parties who start a conflagration are, and should be, responsible for its consequences.

The testimony in this case is too voluminous to permit of a particular analysis; it is enough to say that I find that acts of violence were committed; that terror reigned in this village for several days; that peaceable citizens seeking to obtain work were met on the public highways by large bodies of these strikers and turned back; that persons seeking to move into the town were stopped on the public highway and only permitted to proceed through the interference of a peace officer; that private dwellings were visited by bands of men for the purpose of deterring persons desiring to continue work from doing so; that one of the employes who returned to work was assassinated, all attempts to discover the perpetrator being futile, because of the conditions existing, and all of this done, it is claimed, in the interest of organized labor, a claim which, in my judgment, no class of men will be more swift to repudiate than the fair-minded members of the labor organizations of the country.

A part of the argument submitted by counsel relates to the question whether the laborers were justified in striking. With that question I conceive the court has nothing to do. Men have a right to cease·work whenever they choose, with or without a reason. If they violate a contract the master has his legal remedy in damages, and so long as workmen abandoning work disperse and behave as quiet orderly citizens they are only exercising their rights, but when by force or intimidation they undertake to deter those who are willing to work from so doing they violate the law of the land. On the argument counsel for the defendants admitted that violence, intimidation and all unlawful interference with persons seeking employment with the complainant was an illegal infringement of its property rights, and rested their defence on this branch of the case upon a denial that the conditions which I have found to exist did exist, and I have no hesitation in declaring that such conduct should be restrained.

There is still another branch of this case to be considered, and that is the placing of men, two or three in number, on the highways leading into Minotola, for the alleged purpose of peaceably

persuading laborers from seeking employment with the complainant. After very carefully considering this question I am of opinion that the complainant is entitled to have the defendants restrained from establishing or continuing such picketing, for the only purpose to be served is to intercept persons coming to seek employment with the complainant, and a court should judge of the right to maintain that sort of surveillance over a complainant's business, according to its evident intent and purpose. In its mildest form it is a nuisance, and to compel a manufacturer to have the natural flow of labor to his employment sifted by a self-constituted antagonistic committee, whose very presence upon the highway for such purpose is deterrent, is just as destructive of his property as is a boycott which prevents the sale of his product. As was well said by Judge McPherson, speaking for the United States circuit court: "There is and can be no such thing as peaceful picketing, any more than there can be chaste vulgarity, or peaceful mobbing, or lawful lynching." *Atchison, Topeka and Santa Fe Railway Co.* v. *Gee, 139 Fed. Rep. 582, 584.*

The single object sought to be obtained by picketing is to prevent the complainant from continuing its business by depriving it of one of its essential necessities, namely, labor, for if the picketing has not that object the reason for maintaining pickets would not exist. That a person who has left his employer may approach another and, if he is willing to listen, tell him the truth regarding the conditions existing, does not meet the question being considered, because in this case there is a well-defined scheme in which a number of persons have joined to prevent the complainant from carrying on his business. It is not a case where the individual on his own behalf is taking his grievance to a willing listener, but a combination of men, backed by great wealth, conspiring to deprive the complainant of the means of carrying on its business, with the hope that it will ultimately be compelled to yield and surrender its property to the control of strangers, and any picketing which deprives a citizen of his property rights, which it is manifest the acts complained of in this case are intended to accomplish, is subversive of all law and order, and if permitted to continue will in the end destroy the

prosperity and happiness of society. The defendants frankly admit that the purpose of picketing is to induce every person intending to seek employment with the complainant to refrain from doing so, and attempt to justify it upon the ground that they are competitors of the complainant in the labor market, and being such, have the right to take from it all laborers that they can persuade to leave it or refrain from entering its employ.

Honest competition is what every business man must submit to, but it must be competition and not a malicious intention to injure. Inducing the employes of a person to leave their employment, or others not to accept his employment, for the purpose of crippling his business, where the organization offering the inducement is not engaged in any business competitive or otherwise, and which has no need of the labor, and no reason for interfering beyond the avowed purpose of overthrowing the complainant, in the stand which it has taken against the demand of the organization, that it shall unionize its factory, is not the competition which the law recognizes or upholds, for "the result which they seek to obtain cannot come directly from anything they do within the regular line of their business as workers competing in the labor market. It can only come from action outside of the province of workingmen intended directly to injure another." *Berry* v. *Donovan, 188 Mass. 353.*

It was urged on the argument that the proofs did not show that every defendant was guilty of some act of violence. It, however, appears that all of the defendants were a part of the combination to compel the complainant to unionize its factory. They did not leave their work and go to their homes, but congregated in large crowds, some participating in one act of violence, some in another, and it is impossible, in any ordinary way, to positively identify each member making up a mob of two or three hundred men. They were all at the headquarters provided by the association for the strikers, were all paid out of the funds of the association, and the strikers were under a written contract with the complainant to serve for a definite period, and all joined together in a body to disregard their written obligations. These acts show that a conspiracy was entered into by all of the defendants to compel the complainant to conduct its business under

rules and regulations, to which it was unwilling to submit, and the overt acts of some of the defendants in carrying out the object of the combination, having caused irreparable injury to complainant's property, all those who aided and abetted are equally responsible, and all should be enjoined, for the injunction can work no hardship, as it affects no right of property or restrains the doing of any lawful act.

The complainant is entitled to an injunction against the defendant association and its officers, particularly the defendants Hayes and Agard, restraining it and them from persuading or inducing persons or corporations not to deal with it because it employs non-union workmen, or refuses to be unionized, and against all of the defendants according to the prayer of the bill, except so much thereof as relates to the paying of money to the employes of the complainant, who have left or may voluntarily leave its service.