Complainant operates a factory in Bayonne for the manufacture and sale of broadsilk and rayon. It employs approximately one hundred and ten workers. Its production is approximately $1,000,000 per year. Its verified bill of complaint avers that it complies with all legal requirements applicable to its factory, with the provisions of an act of congress entitled "An act to encourage national industrial recovery, to foster fair competition, and to provide for the construction of certain useful public works, and for other purposes," approved June 16th, 1933, known as N.I.R.A., and with rules, regulations and requirements of the administration of the aforesaid act, known as N.R.A. Its factory is operated under what is generally known as an open-shop plan. An association known as American Federation of Silk Workers, one of the defendants herein, several months ago initiated an effort to unionize workers for the express purpose of forcing an agreement in the silk industry throughout the United States to meet the demands of said association, and recognition of its union, and it has ever since been prosecuting such undertaking. Through the medium of a "national strike committee" workers employed in various factories throughout this country, engaged in such industry, were circularized with *Page 310 
a view of fomenting a labor strike. One of such circulars is attached to and made part of complainant's bill, and reads in part:
"To every silk Worker * * * we choose to fight * * * For the first time in the history of the Silk Workers a National Strike is in progress. * * * Now that we are already out on strike, it is in our hands to continue this strike until we get a national agreement, a decent living wage, backed up by union recognition."
Complainant avers that at the time of filing its bill of complaint none of its employes were affiliated with said defendant, or with any other labor organization.
The economic depression which has been prevalent throughout this country for several years past, causing widespread unemployment, distress, and disorganization of industry and trade, is alluded to in the bill. Provisions of section 1 of N.I.R.A., manifest some of the purposes of such enactment to be "* * * to provide for the general welfare by promoting the organization of industry for the purpose of co-operative action among trade groups, to induce and maintain united action of labor and management under adequate governmental sanctions and supervision, * * * to promote the fullest possible utilization of the present productive capacity of industries, * * * to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry and to conserve natural resources." Complainant avers that on or about July 24th, 1933, official notice was given by governmental authorities to the Silk Association of America, whose rules and regulations govern the operation of complainant's factory, to the effect that until such time as a code of fair competition for the silk industry was formulated by N.R.A., the cotton textile code (copy of which is annexed to and made part of the bill) would be applicable to such industry, and that it has been operating its business in conformity with the provisions thereof, which, among other things, concerns labor relations between employer and employes. The defendant, American Federation of Silk Workers, is a voluntary association comprising locals throughout *Page 311 
the United States of America, and has branch headquarters in Hudson county, New Jersey. The proofs herein show that said association is striving to effect a nation-wide union of employes of the industry in which complainant is engaged, with the object of compelling employers to employ none but members of said union, to pay wages to employes as demanded by said union, and to enforce recognition of said association as a union of workers employed in the silk industry throughout the United States. The proofs show also that amicable relations existed between the complainant and its employes prior to the activities of the defendants, complained of in the bill of complaint and affidavits annexed thereto and made part thereof, and demonstrate that the defendants, and divers persons associated with them in their activities, have unlawfully interfered with the conduct of complainant's business, have molested, coerced, intimidated and annoyed its employes, threatened them with bodily harm, committed acts of violence against them, audibly uttered opprobrious names to, of and concerning them, and applied opprobrious remarks and epithets to such employes, grossly offensive to their sensibilities, provocative of resentment upon their part and tending to altercations, all of which violative of such employes' constitutional right of freedom to engage in lawful pursuit of employment and security to their persons while going to and from their work in complainant's factory. The proofs show also that the complainant has suffered damage to its factory and property contained therein which is reasonably attributable to the defendants and persons allied with them in their aforesaid lawless activities. The defendants, and many persons allied with them, the numbers whereof have been variously estimated in affidavits filed in behalf of the complainant and defendants, respectively, resorted to a practice of picketing complainant's factory and employes, and as a result thereof complainant has been deprived of its lawful right to a free flow of labor to its factory for the conduct of its business. Some of the opprobrious names and opprobrious remarks and epithets, threatening language and offensive remarks, uttered by such picketers to, of and concerning complainant's employes, *Page 312 
are: "You'd better follow in line with us or we'll get you," * * * "You dirty scabs," * * * "Why don't you yellow bellies join in the strike with us?" * * * "You're another filthy scab, we ought to give you the works now," * * * "There goes another scab," * * * "Why don't you get wise to yourself and come out on strike with us?" * * * "You're yellow," * * * "You dirty scab, you're no better than the rest of us, come out and strike with us white people, * * *." I am convinced that the grievances complained of and substantiated herein are attributable to the defendants asintermeddlers. The defendants Raphael Brown, Olga Sacaroff and Nathan Burn are not employes of the complainant; they migrated from places outside of the State of New Jersey with the express intention and purpose of being strike agitators at complainant's factory, and other factories in Hudson county engaged in the same industry as complainant. It appears from the affidavit of the defendant Brown, which is filed in behalf of the defendants, that he and the defendants Sacaroff and Burn were delegated by the American Federation of Silk Workers to visit Bayonne to organize complainant's employes for the purposes hereinabove mentioned. Brown's affidavit asserts he was delegated to devote his attention to organizing the silk workers in Hudson county, and to induce them to join the American Federation of Silk Workers; it asserts also that he commingled with complainant's employes, and expressed to them his pleasure of the manner in which they were doing their picket work, characterizing same as "an admirable job." The proofs herein show that conditions in the vicinity of complainant's factory have been such, as a result of the activities of the defendants and their allies, that numerous city police officers constantly patrol the streets in the vicinity thereof to prevent breaches of the peace. Affidavits filed in behalf of the defendants manifest that a hundred or more employes of complainant, supervised by defendants Brown, Sacaroff and Burn, have been engaged in picketing the streets in the vicinity of its factory. Affidavits filed in behalf of the complainant manifest approximately three hundred persons are so engaged. *Page 313 
An affidavit of Eleanor Wolinsky, an employe of complainant, filed in behalf of the defendants, admits that some of the picketers called her a "scab" while she was passing them, and thus corroborates to such extent complainant's proofs as to opprobrious words uttered to, of and concerning its employes while going to and from their work in its factory. All of the affidavits filed in defendants' behalf say: "This strike is a national strike and applies to all silk workers," and evidence that the affiants were among those engaged in picketing complainant's factory and employes. Considerable of the matters contained in the affidavits filed in behalf of the defendants are made up of hearsay, argument, conclusions and opinions, and therefore, to such extent, of no evidential value. Complainant's bill avers that its employes were induced by defendants to quit its employ without first making known to it that they considered themselves in anywise aggrieved, and in such respect violated the aims, purposes and spirit of N.I.R.A. and N.R.A. Affidavits of employes attached to and made part of complainant's bill include that of William W. Rehrig who says that on Thursday, September 21st, 1933, just as he reached the entrance of complainant's factory he was surrounded by one hundred men and women who were picketing there and attempted to detain him, and as he tried to make his way into the factory they yelled after him, "you're another filthy scab, we ought to give you the works now;" also an affidavit of Fred Unger who says that on Thursday, September 21st, 1933, just as he reached the entrance to complainant's factory one of the men picketers accosted him and started to push him around, called him vile names, and warned him that if he knew what was good for him he had better stay away from the factory and join the strike. He also says that when he entered the complainant's place of business he observed that thirty windows had been broken on the south side of the factory, and that silk which was placed alongside of the windows was badly damaged; also an affidavit of Margaret Casper who says that on Thursday, September 21st, 1933, while going to work she was confronted with a group of picketers who were stationed at the street *Page 314 
entrance leading to complainant's factory, and as she passed them they yelled after her: "There goes another scab. Why don't you get wise to yourself and come out on strike with us? You're yellow," and warned her that unless she went out on strike with them they would do her bodily harm. Her affidavit manifests that she is desirous of working in complainant's factory to support herself and her aged father and mother, but that she is afraid because of the threats made against her; also an affidavit of May Brown who says that on Thursday, September 21st, 1933, as she was going to work and turned the corner of Fifty-second street and the Boulevard, she was surrounded by over one hundred girls who were picketing, one of whom grabbed her right arm and said: "You dirty scab, you're no better than the rest of us, come on out and strike with us white people;" that they hurled threats at her and told her that if she went back to work it would be just too bad for her. She says she is desirous of working for complainant but is afraid of the strikers and that they will carry out their threats; also an affidavit of Mildred Cherchio who says that on Thursday, September 21st, 1933, as she was walking to the entrance of complainant's factory she was stopped by a group of fifty girls who began to push her away from the factory entrance, telling her that she had no business going to work, that it was a serious strike, and that it would be just too bad for her if she went back to work. She says she would like very much to go back to work, because she had no complaint against her employer, but was afraid to do so, fearing the picketers might inflict serious injury upon her; and also an affidavit of Ben Farina who says that on Thursday, September 21st, 1933, while on his way to work a large group of women saw him in front of complainant's factory and called to him and told him that it would not be wise for him to go into the factory as they were trying to call a strike and that if he valued his life he had better stay away. The proofs throughout manifest coercion and intimidation of complainant's employes, and that complainant suffered damage to its property, as a result of defendant's activities. The N.I.R.A. provides (section *Page 315 
3-a) that codes established thereunder shall not permit monopolies or monopolistic practices. Such provision is applicable to both employers and employes; there can be no monopoly of business, and no monopoly of labor. It is the right of complainant to hire, discharge or advance its employes on the basis of individual merit, without regard to their affiliation or non-affiliation with any labor organization. Complainant's workers should not be subjected to coercion, intimidation, opprobrious names and epithets, threats, annoyance or interference by any persons while going to and from their work, and particularly by intermeddlers, that is, by persons such as defendants Brown, Sacaroff and Burn who are not employes of complainant. It cannot reasonably be gainsaid that if working people were allowed without molestation, intimidation, threats of bodily harm, annoyance or interference by intermeddlers, such as so-called labor union business agents, organizers, and the like, to bargain collectively direct with their employers with respect to hours of labor, wages, and other working conditions, the great unrest, turmoil, and disorganization of industry and trade, which is prevalent throughout this country at the present time, some of it in municipalities in Hudson and Passaic counties, respectively, of which the court must take judicial notice because of the public notoriety thereof, occasioned by strikes, picketing, and lawless activities in connection therewith, which has caused chaotic business conditions and fomented trouble not only for those workers willing to bargain their labor to employers willing to avail themselves thereof and pay a satisfactory compensation or wage therefor, but for the public at large — which has long suffered from economic disturbances, such unrest, turmoil, and disorganization of industry, would readily be obviated. Section 7 of N.I.R.A. provides inter alia: "(1) That employes shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or *Page 316 
other mutual aid or protection * * *." Such provision, in my judgment, is tantamount to meaning that employes of a particular factory or business plant may avail themselves thereof for equitable adjustment of grievances, real or fancied; that it means in the instant case that the employes of complainant may avail themselves thereof; but that it does not mean that intermeddlers such as defendants can intervene. Wages exigible for employes in a particular territory may not be exigible in other territory. President Roosevelt has by "Interpretation No. 1," concerning paragraph 7 of N.I.R.A. (see N.R.A. Bulletin No. 4, page 12) opined that — "rates of pay for employes above the minimum wage group shall be increased by "equitable readjustments." No hard and fast rule can be laid down for such readjustments, because the variations in rates of pay and hours of work would make the application of any formula unjust in thousands of cases." In N.R.A. Bulletin No. 3 (clause 5) it is said: "The employes' paart is * * * to co-operate with N.R.A. and employers in peaceful adjustment of differences." In N.R.A. Bulletin No. 1 (pages 2 and 3) it is said: "* * * This is a time for mutual confidence and help and we can safely rely on the sense of fair play among all Americans to assure every industry which now moves forward promptly in this united drive against depression that its workers will be with us to a man."
The principles and purposes of N.I.R.A. and N.R.A. augur well for the country at large, if co-operated in and substantially observed and adhered to by both employers and employes. Neither N.I.R.A. nor N.R.A. may foster a nation-wide confederation of workers, any more than a nationwide confederation of capitalists who engage in industries wherein such workers are employed. There can be no special privilege afforded either class against the other. Labor is property; capital is property; both must be equally safeguarded. As declared in official bulletins issued by the administrator of N.R.A., labor does not have to resort to strike measures to remedy a grievance since the establishment of N.I.R.A. and N.R.A., under which competent and impartial *Page 317 
forums have been created for the mediation of grievances between employers and employes with a view of effecting equitable adjustment thereof. The courts will take judicial notice of such forums. An employer has an indisputable right to conduct its business and deal with its employes without interference by intermeddlers such as organizers, strike agitators, and the like, affiliated with nation-wide labor organizations. If workers employed in an industry or trade in a particular locality may bargain collectively with their employer, and the employer can be assured it may so bargain, without outside interference, satisfactory results would doubtless be attained by both. In view of the means afforded employes to effect mediation of alleged grievances against their employer before impartial mediators such as provided under N.R.A., it is inconceivable that they should be permitted to resort to strikes ad libitum against their employer. Such practices, while the aims and purposes of N.I.R.A. and of N.R.A. are sought to be effected, must be regarded as taboo. The policy of N.R.A. is not only, by codes, to standardize fair competition for trade and industry, but to regulate equitably wages, hours of labor, and working conditions of laboring classes. Neither capital nor labor may be permitted to dominate one another. The turmoil which has been occasioned in industry and trade by recent strikes of workers in the silk industry throughout the country, and as stated hereinabove in the silk industry in Hudson and Passaic counties, is indefensible by those responsible therefor, and particularly at a time like the present when the chief executive of our nation is striving zealously to place industry and trade on a firm foundation for prospering them. It is not difficult to perceive that the immediate effect of strikes is increased unemployment and distress. Considering the means afforded by N.R.A. for equitable readjustments of real or fancied grievances between an employer and its employes by boards of mediation created under the authority of N.I.R.A., strikes by employes, and particularly sympathetic strikes such as seem to be so much in vogue at the present time, wherein intermeddlers intervene, cannot be countenanced by courts of *Page 318 
equity when recourse is had thereto by employers alleging themselves to be aggrieved thereby, and such courts should in appropriate cases and upon appropriate proofs of disregard of N.I.R.A. and N.R.A. provisions and requirements, enjoin such undertakings and practices. In Hitchman Coal and Coke Co. v.Mitchell, 245 U.S. 229; 38 Sup. Ct. Rep. 65 (at p. 72), it was held that "collective bargaining" must be the result of voluntary action by both employer and employes. In view thereof courts of equity cannot countenance strikes against employers engaged in industrial pursuits, and picketing in connection therewith, particularly by intermeddlers, when no fair effort has been made to adjust alleged grievances by employer and employes. Activities of third parties, such as the defendants in the casesub judice, to disrupt complainant's business, upon the pretense they are seeking to advance the interests of complainant's employes whom they have induced to quit work in complainant's factory, when their real purpose was and is to effect a joinder of labor forces in the general industry throughout the country, of which the complainant is but a small part, is illegal, and will be enjoined. Whatever the right may heretofore have been regarded to be as to strikes by employes of a particular factory engaged in industry, third parties have never had a right to coerce or instigate employes thereof to strike. In Folsom v. Lewis, 208 Mass. 336; 94 N.E. Rep. 316,
which was a suit for injunction to restrain defendants from calling or declaring a strike and from proceeding with a strike already called to "unionize" the plaintiff's shop, and for other reasons, and wherein an injunction was granted restraining among other things a strike called to force the signing of a closed shop agreement, the court said: "The master was undoubtedly right in finding that the purpose of the defendants and the real object of the strike was not so much to obtain certain slight advantages referred to in the proposed agreement, as to compel the employers, by inflicting this injury upon them, to submit to an attempt to obtain for the union a complete monopoly of the labor market in this kind of business, by forcing all laborers who wished to work to join the union, *Page 319 
and by forcing all employers to agree not to employ laborers, except upon such terms as they could make with the combination that should control all labor in this business. This has been held to go beyond the limit of justifiable competition. Conduct directly affecting an employer to his detriment, by interference with his business, is not justifiable in law, unless it is of a kind and for a purpose that has a direct relation to benefits that the laborers are trying to obtain. Strengthening the forces of a labor union, to put it in a better condition to enforce its claims in controversies that may afterwards arise with employers, is not enough to justify an attack upon the business of an employer by inducing his employes to strike." See Berry v.Donovan, 188 Mass. 353; 74 N.E. Rep. 603; 5 L.R.A. (N.S.)899. It is not difficult to perceive that picketing by a great number of persons, such as in the instant case, tends to intimidate those who desire to become employes of the complainant, even though no acts of violence be committed. Manifestly, the use of a large number of pickets cannot reasonably be regarded as intended for a lawful purpose. The assembling of a large number of persons on the streets leading to complainant's factory, acting as pickets, undoubtedly has a tendency to terrorize other persons who may desire to work for complainant whose place of business is thus picketed. InAmerican Steel Foundries v. Tri-City Central Trades Council,257 U.S. 184; 42 Sup. Ct. Rep. 72, opinion by Chief-Justice Taft, it is said that the term `picket' indicates a militant purpose, inconsistent with persuasion; and that though a striker may accost an employe on the street with a view to persuade him to cease employment, persistence, importunity, and dogging the employe after the offer of information or advice is declined is unjustifiable annoyance and obstruction, which is likely soon to savor of intimidation, and from such the person sought to be influenced has a right to be free and his employer has a right to have him free. In the same case it was held that the posting of three or four groups of pickets, each group composed of from four to twelve men who were members of various unions involved, in the street through which the employes of the *Page 320 
plant against which the strike was declared had to pass to and from work, so that the passage of employes was in effect running the gauntlet, in itself was intimidation and inconsistent with peaceable persuasion. The court further held: "A restraining order against picketing will advise earnest advocates of labor's cause that the law does not look with favor on an enforced discussion of the merits of the issue between individuals who wish to work, and groups of those who do not under conditions which subject the individuals who wish to work to a severe test of their nerve and physical strength and courage." In Levy Devaney, Inc., v. International Pocketbook Workers' Union
(Conn.), 158 Atl. Rep. 795, the court declared that well-considered authorities all hold that the conduct of a strike may be such as to constitute intimidation, though there is no use of force or physical violence. One of the authorities cited as so holding is Keuffel Esser v. International Association ofMachinists, 93 N.J. Eq. 429. In the Levy Devaney, Case,supra, it was also held: "To intimidate is to inspire with fear, to over-awe or make afraid. Fear may be inspired without physical violence or spoken threats, and moral intimidation may be accomplished by a menacing attitude and a display of force which may coerce the will as effectually as actual physical violence." There is ample proof in the case sub judice that a number of complainant's employes were thus intimidated. AlthoughP.L. 1883 p. 36; 3 Comp. Stat. p. 3051 § 128, provides: "That it shall not be unlawful for any two or more persons to unite, combine or bind themselves by oath, covenant, agreement, alliance or otherwise, to persuade, advise or encourage, by peaceable means, any person or persons to enter into any combination for or against leaving or entering into the employment of any person, persons or corporation," nevertheless, the boundary between lawful and unlawful conduct has been held to be that betweenpeaceable persuasion and intimidation. In the Levy DevaneyCase, supra, the court, in declaring that the term picket
indicates a militant purpose inconsistent with peaceable persuasion, declared that "picketing" has for its purpose the backing up of persuasion with a show of physical force, *Page 321 
and almost inevitably tends to intimidation and violence, so that the phrase "peaceable picketing" is a contradiction in terms. InJersey City Printing Co. v. Cassidy, 63 N.J. Eq. 759, it was held that employers, where third persons interfere with persons willing to be employed, against the latter's consent, by personal molestation, with intent to coerce such persons to refrain from entering such employment, and by personal annoyance, have a right to an injunction to restrain such third persons from so interfering with the persons seeking employment, such interference being an invasion of the right of employers to have labor flow freely to them. In the matter sub judice it is denied in affidavits filed in behalf of defendants Brown, Sacaroff and Burn that they have done the things complained of by complainant. If such be the fact (I do not believe it to be the fact) the granting of a restraint pendente lite cannot operate to their disadvantage or detriment. Counsel for defendants in argument herein said: "We are frank to concede that the strike may be inimical to the purposes of the National Recovery act, * * *." He also referred to chapter 207 of the laws of 1926 entitled, "An act relating to disputes concerning terms or conditions of employment, the communicating of information and limiting the issue of restraining orders and injunctions in certain cases," which provides: "No restraining order or writ of injunction shall be granted or issued out of any court of this state in any case involving or growing out of a dispute concerning terms or conditions of employment, enjoining or restraining any person or persons, either singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from peaceably and without threats or intimidation recommending, advising or persuading others so to do; or from peaceably and without threats or intimidation being upon any public street or highway or thoroughfare for the purpose of obtaining or communicating information, or to peaceably and without threats or intimidation persuade any person or persons to work or abstain from working, or to employ or to cease to employ any party to a labor dispute, or to peaceably and without threats or intimidation recommend, *Page 322 
advise or persuade others so to do, provided said persons remain separated one from the other at intervals of ten paces or more." I deem it unnecessary to comment herein upon the provisions of said act, for the purpose of my determination of the matter subjudice, other than to say that the proofs herein clearly manifest that it is inapplicable to said matter, even though regarded as intended to curtail or minimize the powers of the court of chancery, a constitutional court, of its equity jurisdiction which does not emanate from the legislature, and which cannot be circumscribed by said body. If the prerogatives of the court of chancery — which do not emanate from and are not dependent upon the legislature, could be encroached upon by said body as attempted by the aforesaid enactment, it is not difficult to visualize that through frequent like encroachments the court might eventually be rendered inert. Such is inconceivable under the present state of the law. I am of the opinion that what was said by Vice-Chancellor Stevenson in Jersey City Printing Co.
v. Cassidy, supra (at p. 770), is pertinent herein and applicable to the matter sub judice. In that case the vice-chancellor held that notwithstanding the denial of defendants of the charges made against them, the restraining order should be held in force as to those defendants who stood fairly charged, under oath, with the interdicted misconduct; that the sole issue appeared to be one of fact, viz., whether the defendants had done and were threatening to do the acts complained of or not; and that such an issue could not properly be tried on ex parte affidavits, but should be reserved for the final hearing; but that in a case like the one in question, where the defendants were the only persons in sight, apparently, interested in having the unlawful conduct complained of continued, and were therefore subjected to a temptation to cause such conduct to be continued, an injunction which merely prevented them from doing acts which they disclaimed any right to do, and denied that they had done or threatened to do, should be retained until the final hearing. It is argued in behalf of the defendants that the discretion of the court should not be exercised herein in the complainant's favor, because of the rule laid down in *Page 323 Citizens Coach Co. v. Camden Horse Railroad Co., 29 N.J. Eq. 299,
declaring that where the complainant's proofs are fully and satisfactorily met by those of the defendants, no injunction will go in advance of the final hearing. I am of the opinion that the complainant's proofs have not been fully and satisfactorily met by the defendants. As stated by our court of errors and appeals in Ideal Laundry Co. v. Gugliemone, 107 N.J. Eq. 108 (at pp.115, 116): "While the general rule is that a preliminary injunction will not issue where the material fact in complainant's bill and affidavits, on which the complainant's right depends, is met by a full, explicit and circumstantial denial, under oath, yet, where the denial lacks those essential qualities, and upon the entire showing from both sides it appears reasonably probable that the complainant had the right claimed, the injunction may issue." Such I regard to be pertinent to the matter sub judice. In Meyer v. Somerville Water Co., 79 N.J. Eq. 613,615, it is said: "The object of a preliminary injunction is to prevent some threatening irreparable injury pending a full and deliberate investigation of the case upon the merits." I consider such rule of law to be applicable herein. If a restraint pendente lite should not be granted to the complainant herein it is not difficult to appreciate that if defendants were to continue the unlawful practices complained of, during the time, perhaps several months hence, when the above-stated cause may be brought on for final hearing, the damage which complainant would sustain would not only be immeasurable, but irreparable.
I will advise an order restraining defendants pendente lite
from activities indicated hereinabove to be unlawful, in so far as prayed in complainant's bill. *Page 324