The complainant Elkind Sons, Incorporated, conducts a retail shoe store at 707 Broad street, Newark, New Jersey, and the complainant Miles Shoe Stores, Incorporated, conducts a retail shoe store at 99 Market street, Newark, New Jersey. They seek an injunction restraining the defendants from unlawful interference with their business. The matter came on for a hearing on November 14th, 1933, on the return of an order to show cause advised by Vice-Chancellor Stein on October 27th, and the preliminary restraint imposed by that order was continued pending the final hearing. Because of some apparent misunderstanding of the court's decision and the reasons therefor and to avoid further misunderstanding, these conclusions are written.
The complainant Miles Shoe Stores, Incorporated, operates more than fifty retail shoe stores in the metropolitan area and the executive offices are in New York City. The bill alleges, and it is not denied, that both complainants have been in business for many years; that their business is conducted on the open shop plan and that they have had no strikes or labor troubles of any kind before the present controversy; that they have in all particulars complied with the N.R.A. code applicable to their business and, in fact, pay salaries to their employes approximately thirty per cent. higher than those established by that code.
On or about October 19th, 1933, the defendant Rosenberg, who is the business agent of the defendant Retail Clerks' International Protective Association, called upon the executives of the complainant companies and "demanded" (Rosenberg's term as used in his affidavit) that they and their employes sign an agreement with the Retail Clerks' International Protective Association to become members of Local No. 708 of said association, comply with that association's rules and employ members of that organization and no others; and to *Page 588 
immediately discharge such of their employes as were not members upon pain of strike of their employes, the creation of a boycott, and picketing in front of their respective places of business with placards charging non-compliance with the N.R.A. and unfairness to union labor. The bill charges, and the charges are amply verified, that defendants threatened that "they would cause this strike despite the fact that the employes of Elkind Sons, Incorporated, were satisfied with their employment, length of working hours, and salaries received; that they would cause these placards above referred to to be carried in front of the premises in military fashion, through which procedure they would make it impossible for people to come into the store or to see the display in the windows and to make it so generally uncomfortable and impossible to do business as would disrupt the entire organization and cause financial failure of the complainants."
The "demands" were refused and the defendant Rosenberg then called upon the complainants' employes to walk out. Of the nine employes of Elkind Sons, Incorporated, at 707 Broad street, one walked out; and of the ten employes at the Miles Shoe Store, Incorporated, 99 Market street, four walked out. Immediately the defendants began carrying out their threats, established a line of pickets in front of the complainants' stores with placards as threatened and, as complainants claim, blocked the entrance to their stores and at times stood in front of the show windows in such a manner as to prevent window shopping. Acts of annoyance and threats of violence are also alleged. At the time the defendants' activities were begun there was no controversy between employer and employes and no known or expressed dissatisfaction on the part of the employes with the terms or conditions of their employment; and no strike and no labor troubles of any kind had ever been experienced by the complainants during all of the years in which they had been engaged in business.
On the return of the order to show cause no answering affidavits were filed by the defendants and none have since been filed; but counsel for the complainant has furnished me with copies of answering affidavits served upon him prior to *Page 589 
the return day. While these answering affidavits are not a part of the file in this cause, I have nevertheless examined and considered them, as it is assumed they were intended to be filed.
There are more than fifty of these affidavits. Twenty-five of them are affidavits of non-employes who acted as pickets, and seven of affiants who claim to have been former employes of complainants and who also acted as pickets. There are also affidavits of six police officers of the city of Newark who were on duty in the vicinity of the complainants' stores during the period of the activities forming the basis of the complaint.
The objects of the present strike, as stated in the affidavit of the defendant Rosenberg, are "to endeavor to obtain recognition of the union voluntarily from the employers and also to obtain consent of the employers to hire only our members in connection with their business." (Italics mine.)
The affidavits of the several police officers are to the effect that they observed no violence and heard no threats, but Officer McCarthy says: "In accordance with Sergeant Dougherty's orders I prevented the pickets from blocking the store entrance and kept them moving at all times." Sergeant Dougherty verifies his instructions to that effect. Most of the affiants who were in the picket line aver that there were never more than two pickets "in line" in front of complainants' stores at any one time, and they deny having blocked the entrances or the view of the windows; but it is significant that many of the affiants aver that when they were not in the so-called picket line they went to both stores at various times during the day to observe what was going on. The complainants claim there were many more — crowds, congregated in front of the stores from time to time and both complainants and defendants claim to have called the police to maintain order.
Each of complainants' stores has a street frontage of only twenty feet or less, and when it is considered that there were at least thirty-two pickets in line at some time during the day; that those not on duty in the picket line were at times *Page 590 
acting as observers at one store or the other, and that six police officers were also on hand to preserve order, I think it may logically be inferred that the show of force was sufficient to be intimidating, not only to the employers and employes, but to prospective customers as well. The necessary presence of the police officers accentuated, in the public eye, the militant character of the assemblage.
The purpose of the so-called strike and the object of the defendants' demands was to compel the complainants to adopt the closed shop and employ only union labor. This is evident from the form of the proposed agreement and is confirmed by the affidavit of the defendant Rosenberg. True, the form of the agreement contains some provision respecting working on holidays, but there was no such issue between employers and employes. Nor, in fact, was there any issue at all until one was made by the defendant Rosenberg. The defendants sought to hide their real purpose behind the pretense that they were seeking to advance the interests of the employes; but this was a service unsought and unasked for by them. It may have been acquiesced in by some, but it was forced upon most of them. The strike agitators were mere volunteers. They sought mainly to advance their own personal interests by demonstrating to their superiors their usefulness in inciting strikes and their ability to enforce their demands. They assumed the rule of those aptly characterized by Vice-Chancellor Fallon in Bayonne Textile Corp. v. American Federation of SilkWorkers, 114 N.J. Eq. 307, as "intermeddlers." They have no place in the administration's program for economic recovery.
The law applicable to this controversy cannot, I think, be in substantial dispute. It is claimed by the defendants that their sole offense, if any, is what is termed "peaceful picketing" and that what they have done is entirely within their rights and is specifically authorized by chapter 207. P.L. 1926 p. 348; Cum.Supp. Comp. Stat. p. 894. I do not, however, take that view of the matter. And picketing is not the only offense with which the defendants are charged. The admitted "demands" of the defendants for the closed *Page 591 
shop were unlawful (Hitchman Coal and Coke Co. v. Mitchell,245 U.S. 229; 62 L.Ed. 260) and the "demands" that complainants sign the proposed agreement on the dotted line is not only unlawful, but audacious in the extreme.
In the recent case of Aimco, Inc., v. Panaswitz, docket 99, page 172, in an unreported opinion, Vice-Chancellor Buchanan referring to a strike to enforce the "closed shop," said:
"That purpose has been repeatedly denounced as unlawful not only by the courts of this state, but also by the supreme court of the United States and the courts of practically every other state in the union where the question has been considered.
"Trade unions are lawful and laudable, in themselves. * * * But any endeavor on their part to establish a monopoly of employment — utterly to deprive other men of an equal right to the opportunity for similar employment in the locality — is as reprehensible, as indefensible, as unlawful as would be a combination of employers in an agreement that no member of a union would be employed by them. It is absolutely contrary to the principles of liberty and freedom of opportunity, to the preservation of which this country is dedicated."
This correct statement of the law is as applicable here as there. The "strike" called by the defendants being for an unlawful purpose, any act in furtherance thereof, including the picketing complained of, is unlawful. The right of labor unions to persuade and induce, by all lawful means, employers to employ only union labor, is not denied; but no employer can be lawfully compelled to do so against his will. Truax v. Corrigan,257 U.S. 312; 66 L.Ed. 254; O'Gorman Young, Inc., v. HartfordFire Insurance Co., 282 U.S. 251, 267; 75 L.Ed. 324.
Section 7b of the Retail Stores Code provides that "no employe and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing or assisting a labor organization of his own choosing." With this provision and *Page 592 
that of the N.R.A. authorizing collective bargaining, I am in entire accord. But these salutary provisions in the interest of honest labor do not spell the closed shop, nor can they be considered as authority for the unlawful acts of the defendants. They were not intended to foster strikes, nor to permit the personal exploitation of labor leaders at the expense of either labor or capital. The obvious corollary of section 7b of the code is that the employer shall not be required to adopt the closed shop against his will. The defendants' "demand" for the closed shop was clearly in violation of the code. But in considering the effect of the N.R.A. and the codes adopted by authority thereof and their application to this controversy, it is well to bear in mind the language of Mr. Justice Pitney, speaking for the supreme court of the United States in Hitchman Coal and Coke Co. v.Mitchell, supra. He there said:
"This court repeatedly has held that the employer is as free to make non-membership in a union a condition of employment, as the working man is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power."
In Bayonne Textile Corp. v. American Federation of SilkWorkers, supra, Vice-Chancellor Fallon said:
"The N.I.R.A. provides (section 3(a)" — 15 U.S.C.A. ¶ 703
(a) "that codes established thereunder shall not permit monopolies or monopolistic practices. Such provision is applicable to both employers and employes; there can be no monopoly of business, and no monopoly of labor. It is the right of complainant to hire, discharge, or advance its employes on the basis of individual merit, without regard to their affiliation or non-affiliation with any labor organization."
Also that under the N.R.A. and codes "impartial forums have been created for the mediation of grievances between employers and employes with a view to effecting equitable adjustments thereof," and that "considering the means afforded by the N.R.A. for equitable readjustments, * * * *Page 593 
strikes by employes, and particularly sympathetic strikes * * * wherein intermeddlers intervene, * * * cannot be countenanced by courts of equity."
In Aimco, Inc., v. Panaswitz, supra, Vice-Chancellor Buchanan said:
"Employes, whether as members of a union or otherwise, who strike, under the present-day conditions of emergency and in the face of the legislation and facilities provided by congress and the administration for their relief and betterment — especially where they have made no effort to utilize the means so provided in the effort to obtain the betterment and advantages they seek — are acting unreasonably and unpatriotically, if not indeed unlawfully. They do harm to themselves in loss of wages, harm to their employers in loss of business, and harm to the entire public by retarding the economic recovery. If their objects are in anywise reasonable and justifiable, they can accomplish them without any of this harm and damage, by resorting to the agencies set up for that very purpose, and remaining at work while the issues are being determined by those agencies."
He also said that in view of these circumstances "strikes are forbidden by the public policy of nation and state." With all of this I heartily agree.
With respect to the picketing complained of, Gevas v. GreekRestaurant Workers' Club, 99 N.J. Eq. 770, is controlling. It would serve no useful purpose to restate the law of that case here. Its application is obvious.
In Truax v. Corrigan supra, Chief-Justice Taft, referring to American Steel Foundries v. Tri-City Central TradesCouncil, 257 U.S. 184; 66 L.Ed. 189, in which he also wrote the opinion for the supreme court of the United States, said: "We held that under these clauses picketing was unlawful, and that it might be enjoined as such, and that peaceful picketing was a contradiction in terms." That statement was penned by the highest judicial officer, and adopted by the highest judicial tribunal, of the United States. It is the settled law of the land and must be recognized as such by this court and all other inferior tribunals. Picketing is a militant word and the act of picketing is militant in both *Page 594 
character and purpose. Its purpose, compulsion or coercion, is accomplished only by intimidation.
But chapter 207 (P.L. 1926 p. 348) is invoked by the defendants in justification of the picketing of complainants' stores. If it were intended by that act to legalize picketing that intention must be found to be expressed in these words: "No restraining order or writ of injunction shall be granted or issued * * * enjoining or restraining any person or persons either singly or in concert * * * from peaceably and without threats or intimidation being upon any public street or highwayor thorofare for the purpose of obtaining or communicatinginformation * * * providing said persons remain separated onefrom the other at intervals of ten paces or more." (Italics mine.) The undisputed facts show that the admitted picketing was not within the limitations of the act. "Ten paces" is approximately thirty feet. The stores have a street frontage of only twenty feet. Two pickets parading in that twenty-foot space cannot "remain separated one from the other * * * ten paces or more." But it is noteworthy that the word "picketing" is "sedulously avoided" (Truax v. Corrigan, supra), in this act, and the intention to legalize picketing is not apparent. In a limited sense that act was under consideration in the GevasCase, and I there said (at p. 787):
"Legislation of this kind has generally been held to be declaratory of, and not as changing, the laws theretofore in force. Note, 27 A.L.R. 360, 413. Accordingly, such statutes do not render lawful any act or acts which were unlawful at the time the statutes were enacted, and the existence of a dispute is a condition of the immunity to injunction declared by the statute; nor is it enough that such a controversy formerly existed where the employer has been successful in filling the places of the strikers. Quinlivan v. Dail-Overland Co., 274 Fed. Rep. 56;
note, 27 A.L.R. 415. Such statutes have also been held not to apply in the case of strikes for a wrongful purpose."
The act was also under consideration by the court of errors and appeals in Bayer v. Brotherhood of Painters, c., 108 N.J. Eq. 257,
but from all that appears in the court's opinion *Page 595 
in that cause picketing was not involved and the constitutionality of the act was not questioned. But picketing which was unlawful before the act is still unlawful. The legislature cannot legalize a private nuisance — to do so would be violative of the constitutional guarantee of security of person and property. In George Jonas Glass Co. v. Glass BottleBlowers Association, 72 N.J. Eq. 653; affirmed, 77 N.J. Eq. 219,
"picketing in its mildest form" is said to be a "nuisance." And a private nuisance, regardless of its intimidating character or effect, will be enjoined.
In the Tri-City Case, supra, Chief-Justice Taft said:
"We are a social people, and the accosting by one of another in an inoffensive way, and an offer by one to communicate and discuss information with a view to influencing the other's action, are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging, become an unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free, and his employer has a right to have him free."
But this does not suggest that picketing is lawful. In theTri-City Case one "observer" was permitted at each entrance and exit of the complainant's plant with the "right of observation, communication and persuasion, avoiding abuse, libel or threats, and in their efforts singly should not obstruct an unwilling listener by importunate following or dogging of his steps." But this is not "picketing." Inoffensive observers are lawful; militant pickets are not. But the carrying of placards containing false, misleading, threatening or libellous statements by such observers will not be permitted; nor will any militant conduct be tolerated. And it is always a question of fact for the court in each particular case to decide whether the conduct complained of is or is not, in fact, militant or peaceable; or, if peaceable, whether, by reason of its character as a nuisance, or because of other circumstances rendering it inequitable, it should be enjoined. I have no hesitancy in saying that the picketing here complained of is unlawful and should be enjoined. *Page 596