## ON APPEAL FROM THE COURT OF CHANCERY, AND THE PREROGATIVE COURT.

### MARCH TERM, 1910.

*GEORGE JONAS GLASS COMPANY, complainant and respondent,

*v.*

THE GLASS BOTTLE BLOWERS' ASSOCIATION OF THE UNITED STATES AND CANADA et al., defendants and appellants.

[Argued June 19th, 1908. Decided November 16th, 1908.]

1. An injunction sustained, restraining defendants from using either coercion or persuasion in order to bring about breaches of the contracts of personal service existing between complainant and its employes.

2. An injunction sustained against like conduct having for its object and purpose the termination of the relation of master and servant existing between complainant and its employes in cases where there was no binding contract of service, but a mere service at will.

3. An injunction sustained, restraining defendants from interfering, by coercion or personal molestation and annoyance, to prevent persons, not as yet employed but willing to take employment under the complainant, from entering such employment.

---

*Printed out of place.—REP.

4. An injunction sustained against "picketing" designed to molest and annoy persons employed or willing to be employed by complainant.

5. An injunction against a "boycott" sustained.

6. The "Act relative to persons combining and encouraging other persons to combine" (*P. L. 1883 p. 36; Gen. Stat. p. 2344 pl. 23*), does not legitimize an invasion of private rights, nor prevent the party injured from having full redress.

On appeal from a decree of the former chancellor advised by Vice-Chancellor Bergen, whose opinion is reported in *72 N. J. Eq.* (*2 Buch.*) *653.*

Mr. John W. Wescott, Mr. Matthew Jefferson and Mr. Louis H. Miller, for the appellants.

Mr. John W. Harding, for the respondent.

The opinion of the court was delivered by

PITNEY, CHANCELLOR.

The facts of the case are sufficiently outlined in the opinion of the learned vice-chancellor. His findings are, in our judgment, fully sustained by the evidence.

The defendants comprise three classes of persons—*first,* the Glass Bottle Blowers' Association of the United States and Canada, a voluntary association, including in its membership nearly all the journeymen green glass bottle blowers of the United States and Canada; *secondly,* the officers of this association, who, as individuals, are made parties defendant; and *thirdly,* ninety or more individuals who were formerly in the employ of the complainant corporation at its glass works in Minotola, in this state, and who, on April 9th, 1902, went upon strike.

It is undisputed that in the year 1901 the Glass Bottle Blowers' Association instituted a boycott of the complainant's wares in the effort to coerce complainant to conform its business to regulations prescribed by the association. The evidence renders it clear that this boycott was still in force, and was being actively prosecuted by the association down to the time of the strike of

MARCH TERM, 1910. 221

*7 Buch.*    Jonas Glass Co. *v.* Glass Bottle Blowers' Association.

1902 and thereafter, and, indeed, after the filing of the bill of complaint herein.

Whether the defendant association or its officers directly instigated this strike possibly admits of doubt; but it is entirely clear that immediately after the strike began the association, through its executive committee and officers, took charge of it, organized and directed the strikers, and guided them in the subsequent proceedings.

There is abundant evidence that at the time the bill of complaint was filed and thereafter, the association, its officers and the strikers who are joined as defendants, made common cause in a war of subjugation against the complainant corporation. While there are individual defendants who are not shown by the evidence to have been personally implicated in certain of the specific acts of violence and coercion that ensued, they were all acting in concert in the general plan of campaign, and are equally subject to injunction with respect to the unlawful acts that were done and threatened.

The final decree that is now under review awards an injunction restraining the defendants as follows:

*First.* From knowingly and intentionally causing or attempting to cause, by threats, offers of money, payments of money, offering to pay expenses, or by inducement or persuasion, any employe of the complainant under contract to render service to it to break such contract by quitting such service.

*Second.* From personal molestation of persons willing to be employed by complainant with intent to coerce such persons to refrain from entering such employment.

*Third.* From addressing persons willing to be employed by complainant, against their will, and thereby causing them personal annoyance, with a view to persuade them to refrain from such employment.

*Fourth.* From loitering or picketing in the streets or on the highways or public places near the premises of complainant with intent to procure the personal molestation and annoyance of persons employed or willing to be employed by complainant, and with a view to cause persons so employed to refrain from such employment.

*Fifth.* From entering the premises of the complainant against its will with intent to interfere with its business.

*Sixth.* From violence, threats of violence, insults, indecent talk, abusive epithets, annoying language, acts or conduct, practiced upon any persons without their consent, with intent to coerce them to refrain from entering the employment of complainant or to leave its employment.

*Seventh.* From attempting to cause any persons employed by complainant to leave such employment by intimidating or annoying such employes by annoying language, acts or conduct.

*Eighth.* From causing persons willing to be employed by complainant to refrain from so doing by annoying language, acts or conduct.

*Ninth.* From inducing, persuading or causing, or attempting to induce, persuade or cause, the employes of complainant to break their contracts of service with complainant or quit their employment.

*Tenth.* From threatening to injure the business of any corporation, customer or person dealing or transacting business and willing to deal and transact business with the complainant, by making threats in writing or by words for the purpose of coercing such corporation, customer or person against his or its will so as not to deal with or transact business with the complainant.

Each portion of the injunctive relief thus granted is directed to some manifestation of the strife that was carried on by the combined defendants against the complainant. And in each respect the injunction is justified by the evidence in the case.

The employes of complainant referred to in the decree are those who either refused to join the strike or who entered complainant's employ after the strike. With respect to these, it will be observed that the defendants are restrained from using coercion, inducements or persuasion to bring about a termination of the employment, whether the employe be under contract of service or not.

With respect to other persons, not as yet employed but willing to take employment under the complainant, the defendants are restrained from interfering to prevent this by coercion or

personal molestation and annoyance; but are not restrained from using mere persuasion in such a case.

There is a restraint against picketing designed to molest and annoy persons employed or willing to be employed.

And there is a restraint against the continuance of the boycott.

It is clear beyond dispute that the complainant has suffered grievously in its property and business through the acts of the defendants, whose continuance is thus prohibited. That the injury to the complainant is irreparable by action at law is likewise clear.

If, therefore, the acts themselves are unlawful and violative of the property rights of the complainant, the injunction is proper.

The conduct of defendants in using coercion in some cases and persuasion in others in order to bring about breaches of the contracts of personal service existing between complainant and some of its employes—defendants having, of course, full notice of the existing employment—was unlawful and actionable, upon well-settled principles. *3 Bl. Com. 142; Lumley* v. *Gye, 2 El. & Bl. 216, 224; Bowen* v. *Hall, 6 Q. B. Div. 333; Angle* v. *Chicago, &c., Railway Co., 151 U. S. 1, 13.*

And the same is true of conduct whose object and purpose were to bring about a termination of the relation of master and servant between the complainant and its employes in cases where there was no binding contract of service, but a mere service at will. *Noice, Administratrix,* v. *Brown, 39 N. J. Law (10 Vr.) 569, 572; Brennan* v. *United Hatters, 73 N. J. Law (44 Vr.) 729, 743.*

In *Frank & Dugan* v. *Herold, 63 N. J. Eq. (18 Dick.) 443, 450,* Vice-Chancellor Pitney said that to create the relation of master and servant it is not necessary that there should be a contract in writing, or even verbal, between them to work for any particular length of time; that the relation exists when the one person is willing from day to day to work for another, and that other person desires the labor and makes his business arrangements accordingly.

Whether an action will lie for interference in the relations existing between employer and employe where there is a mere

service at will, and where the interference is the result of fair competition in the labor market, is a question mooted but not necessary to be decided in the present case. The defendants were not competitors in the labor market. Their interference had for its immediate object the crippling of the complainant's business. The only semblance of excuse alleged is that defendants desired to bring about "improved labor conditions" in complainant's works; but this object did not warrant the resort to unlawful measures.

Reliance is placed by the defendants upon the "Act relative to persons combining and encouraging other persons to combine." *P. L. 1883 p. 36; Gen. Stat. p. 2344 pl. 23.* The enactment is:

"That it shall not be unlawful for any two or more persons to unite, combine or bind themselves by oath, covenant, agreement, alliance or otherwise, to persuade, advise, or encourage, by peaceable means, any person or persons to enter into any combination for or against leaving or entering into the employment of any person, persons or corporation."

In *Mayer* v. *Journeymen Stonecutters' Asso., 47 N. J. Eq. (2 Dick.) 519, 531,* Vice-Chancellor Green apparently treated this act as legalizing private injuries. And in *Cumberland Glass Manufacturing Co.* v. *Glass Bottle Blowers' Asso., 59 N. J. Eq. (14 Dick.) 49, 53,* Vice-Chancellor Reed construed it as permitting the adoption of peaceable measures for inducing workmen to quit or to refuse to enter an employment. Whatever may have been the purpose of its framer, there are, as we think, constitutional obstacles in the way of giving the act so extensive a force. The rights of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness, are declared by our constitution to be unalienable. *N. J. Const., art. 1 pl. 1.* No act of the legislature is to be construed as infringing upon these rights unless its language plainly and clearly requires such a construction. If its language so reads, it is to the extent indicated unconstitutional and void. The act of 1883 is, as we think, properly to be treated as merely rendering the combination no longer indictable; in effect, as repealing the rule laid down by the supreme court of

this state in *State* v. *Donaldson, 32 N. J. Law (3 Vr.) 151.* It does not legitimize an invasion of private rights nor prevent the party injured from having full redress. Its proper scope is indicated in the opinion of Vice-Chancellor Pitney in *Frank & Dugan* v. *Herold, 63 N. J. Eq. (18 Dick.) 443, 447, 448.*

So much of the decree as awards an injunction to restrain the defendants from using coercive measures to prevent the flow of labor to complainant's works is likewise proper. In *Jersey City Printing Co.* v. *Cassidy, 63 N. J. Eq. (18 Dick.) 759, 765,* Vice-Chancellor Stevenson recognized and enforced the right of an employer to an injunction to prevent undue interference with those who wish to come to him for employment. It is principally upon this ground that injunctions against what is known as picketing have been sustained in this and other jurisdictions.

So much of the decree as is directed against the continuance of the boycott is plainly justified by the evidence, and accords with the law. *Barr* v. *Essex Trades Council, 53 N. J. Eq. (8 Dick.) 101; Martin* v. *McFall, 65 N. J. Eq. (20 Dick.) 91; Temperton* v. *Russell (1893), 1 Q. B. Div. 715; Quinn* v. *Leathem (1901), A. C. 495.*

The decree under review should be affirmed, with costs.

MINTURN, J. (dissenting).

I find myself unable to agree with the majority of my brethren with respect to that portion of the decree of the court of chancery, which authorizes the issuing of an injunction against these defendants, upon the ground stated in the opinion of the learned chancellor speaking for the majority of this court, viz.: "Inducing, persuading or causing or attempting to induce, persuade or cause the employees of complainant to break their contracts of service with complainant or quit their employment."

It may be conceded since the decision of this court in *Brennan* v. *United Hatters, 73 N. J. Law (44 Vr.) 729,* that an ordinary wage employee bears towards his employer, in this state, a relation in modern legal nomenclature denominated as a "service at will;" and for the breach of which an action at law can be maintained.

Still with this concession it is difficult to discern in jurisprudence, outside of the sphere of those English cases which bear the distinct impress of feudal law and custom, any consensus of legal authority which can support the principle upon which this injunction rests; and of those cases Chief-Justice Parker, speaking for the New York court of appeals, said "they are hostile not only to the statute law of this country, but to the spirit of our institutions." *National Protective Association* v. *Cuming, 170 N. Y. 332.*

Their origin is traceable distinctly to that class legislation which followed the emancipation of the villeins, under the feudal tenure; and to the scourge of the "black death" which followed such emancipation in the reign of Edward III., decimating Europe and culminating in what is known as "the statute of laborers" (*22 & 23 Edw. III.*) by virtue of which every vestige of individual freedom to contract and to combine was shorn from the wage worker and his social status was reduced by legislative act to that of a bondman. *1 Green's History of the English People § 4; 2 Bouv. 100.*

Our inheritance of English common law carried with it only such of the English decisions as are consonant with our institutions and our public policy. *1 Kent Com. p. 343.*

Concededly, therefore, the invocation of a line of adjudications emanating from a social order and a political environment radically different from our own, founded upon the feudal concept of "a service at will" in an age of enlightened citizenship, is so utterly repugnant to and incompatible with our basic governmental theory, *vox populi vox Dei,* as to be unsupportable in reason, and opposed to any system of enlightened jurisprudence, which invokes as a justification for its existence, either the dictates of reason, or the wisdom, the experience, or the service of humanity. "Precedents against law or reason," says Lieber, "must be set aside." *Legal and Political Hermeneutics, 219;* and so, *Coke, "Quæ Contra rationem juris introductor sunt, non debent trahi in consequentiam."* The case of the *Proclamations, 12 Coke's Rep. 74.*

The constitutional guarantees, state and federal as well as the bill of rights, reach their protecting arm not only to property

rights, but also to the rights of citizenship and free speech. And while in the march of human progress and national development, the protection of property representing as it does the thrift, economy and energy of a people, is not to be underestimated; still the right to life and liberty has, from the dawn of history, been the potent and dominant factor in the forward march of progress and civilization. *Spenc. Social Stat. ch. 5; Guizot Hist. of Civ. in Europe ch. 2.*

Force or intimidation can never be recognized as a lawful *modus operandi* in the propagation of any doctrine or cult, or for the assertion or prosecution of any right; and to the vindication of this principle the unanimous decisions, both state and federal, bear testimony.

But in the effort to sustain the property guarantees of the fundamental law against infraction, we are apt to lose sight of those guarantees of liberty and happiness which are equally fundamental; and if a concrete case were needed to illustrate this tendency, we find it in the case at bar.

A statute enacted by the legislature of this state and quoted verbatim by the learned chancellor (*P. L. 1883 p. 36*) made it lawful for "any two or more persons to unite, combine or bind themselves to persuade, advise or encourage by peaceable means any person or persons to enter into any combination for or against leaving or entering into the employment of any person or persons or corporation." Assuming that this relationship of a service at will is to be dignified with the status of a formal contract *inter partes,* then *concededly* the terms of this statute must be read into it. *2 Kent Com. 571.*

Upon two occasions at least, this statute has been construed by the court of chancery, not only as relieving such combination of the criminal aspect theretofore ascribed to it, but also as a legislative declaration of public policy, and presumably *sub silentio,* the learned vice-chancellors who passed upon the legal effect of the enactment, found nothing unconstitutional in its provisions.

Thus Vice-Chancellor Green in *Mayer* v. *Journeymen's Stone Cutters Association, 47 N. J. Eq.* (*2 Dick.*) *519,* refused to order the issue of an injunction upon the ground that "the

acts threatened are declared by statute as not unlawful." He characterized the act of 1883 as declaring "a policy of the law" which, in his judgment, has "revolutionized" the common law doctrine of unlawful combination, and concluded his judgment with the statement that the peaceable intervention contemplated by this act was "unoffensive to any provision of our law."

Vice-Chancellor Reed reviewed the same legislation in *Cumberland Glass Manufacturing Co.* v. *Glass Bottle Blowers' Association, 59 N. J. Eq. (14 Dick.) 49,* and stated "The words are perhaps broad enough to legalize a combination to persuade individual workmen to quit, or refuse to enter the service of any person," and refused the injunction on that ground but granted it on another.

Vice-Chancellor Pitney's opinion in *Frank & Dugan* v. *Herold, 63 N. J. Eq. (18 Dick.) 443,* marks the turning point in the construction of this statute, for he there held that it only relieved an act formerly criminal, of its unlawful character, and then dealt with the subject *sub judice* from a constitutional point of view and declared, "It is argued that one person has a right to persuade another to work or not to work. That may be if the other is willing to listen and be persuaded" (at *p. 449*), and again (at *p. 452*), "The operatives have the right which their employers cannot complain of to consider the question whether they desire to work for them any longer and for that purpose they have the right to listen to arguments on that subject."

Vice-Chancellor Stevenson in *Jersey City Printing Co.* v. *Cassidy, 63 N. J. Eq. (18 Dick.) 765,* following the consideration given by Vice-Chancellor Pitney to the statute, termed this service at will "a newly recognized right" and defined it to be "that peculiar element that is an interest which one man has in the freedom of another;" which he further defined as "freedom in the market; freedom in the purchase and sale of all things including both goods and labor;" a right, says the learned vice-chancellor, "that our modern law is endeavoring to insure to every dealer" (at *p. 766*).

Still later in *Fletcher Company* v. *International Association of Machinists, 55 Atl. Rep. 1077,* the same learned vice-chancel-

lor conceded the right to workmen to organize and use peaceable persuasion, substantially as Vice-Chancellor Pitney had conceded it in the *Herold Case.* But in both determinations the learned vice-chancellor makes the right to "the free flow of labor," as he termed it, the *ratio decidendi,* thus instituting an analogy as an economic proposition between goods and merchandise and labor; a fallacy all the more confounding to any attempt at harmonious decision when the statutory enactment in question is disregarded.

The analogy ignores the constitutional guarantee of freedom of speech and freedom of the press representing labor's demands, because labor, unlike goods, cannot be severed from the human entity and be considered apart from the man, for as Locke says, "Every man has a property in his own person, this nobody has a right to but himself." *Essay on the Human Understanding ch. 6.* It ignores factory and inspection laws, child labor laws and those legislative protective enactments for workshop and factory, intended to mitigate the hardship incident to the application of the legal rule of assumption of risk, all of which are proper subjects for discussion between fellow-workmen, with a view to enforcing compliance by the employer with the law as the alternative to a strike. It ignores the fact that in every line of trade and business, combination is the tendency of the age, and that in this state our Corporation act is designed to accomplish that very purpose and has accomplished it to a great extent throughout the land. The maxim that "competition is the life of trade" is not contained in the lexicon of the political economy of this day, and eminent jurists have noted the fact of its elimination as an axiom in commercial life—except it would seem in its application to the wages of labor, in which event, the law of supply and demand and the creation of a free labor market, as indicated by the learned vice-chancellor practically relegates the wage earner to the status of a chattel, and corresponds to the judicial conception entertained of black labor in the *Dred Scott Case. Dred Scott* v. *Sandford, 19 How. 393.* In the case at bar the learned chancellor goes further and declares the act of 1883 to be unconstitutional in its application to private rights as in contravention of article 1, page 1, of the state constitution.

It certainly would be indefensible tested by this constitutional guarantee, if it empowered these defendants to combine to destroy property or to combine for any other unlawful purpose. But such is not its intent, since it simply empowers a number to do what it would be perfectly lawful for one to do, and such a power has been repeatedly held to be constitutional. *National Protective Association* v. *Cummings, 170 N. Y. 315; Wabash Railroad* v. *Hannahan, 121 Fed. Rep. 563; Martell* v. *White, 185 Mass. 255.*

The right conferred is in essence only the fundamental right of free speech, and the sole limitation upon that natural right is, that those exercising it "are answerable only for their acts in the interests of good citizenship, morality and decency." *United States* v. *Williams, 194 U. S. 279; Roberts* v. *Baldwin, 166 U. S. 261; Wise Cit. 189.*

It is to be noted that this constitutional provision is but a paraphrase of the provision upon the same subject contained in the bill of rights; and it is to be observed that when that great charter was promulgated a crisis was impending, in which the great *desideratum* was not the right to enjoy property, but the right to enjoy personal liberty, and to pursue individual happiness, without regal interference. That document provided

"that all men are by nature equally free, independent and have certain inherent rights of which, when they enter into a state of society, they cannot by any compact deprive or divest their posterity, namely, the enjoyment of life and liberty with the means of acquiring and possessing property and pursuing happiness and safety." *Revised Code of Virginia (1819), vol. 1 p. 31.*

This conception of life and liberty has dominated all other considerations in the development of constitutional law; and has led the United States supreme court in furtherance of its application under the police power, to ignore the fact that judicial recognition of it was tantamount to the destruction of the private property involved. *Slaughter House Cases, 83 U. S. 36; Stone* v. *Mississippi, 101 U. S. 814; Mugler* v. *Kansas, 123 U. S. 623.*

But the denial of this right to combine in furtherance of free speech implies such a discrimination against these defendants that it may, with perfect propriety, be argued that their rights

as citizens are denied to them in contravention of the fourteenth amendment of the federal constitution, which guarantees that their privileges and immunities as citizens shall not be abridged. *Strauder* v. *West Virginia, 100 U. S. 303; 1 Kent Com. 621.*

In other jurisdictions, the correct rule is declared to be in consonance with the spirit and language of the statute of 1883. Thus the Virginia supreme court of appeal has declared that it is "not unlawful for strikers to persuade employes to leave the service of their employer or to dissuade other workmen from seeking employment with him" when unaccompanied by force or intimidation. *Everett Waddy Co.* v. *Richmond Typographical Union et al., 105 Va. 188; National Protective Association v. Cummings, 170 N. Y. 315; Jones v. Van Winkle Machine Works (Georgia Supreme Court), 628 E. R. 236; 8 Anno. Cases 796,* and cases cited; *24 Cyc. 831,* and cases cited.

It may be appropriate to conclude this reference by quoting an extract from the opinion of Judge Taft, sitting in the United States circuit court in *Phelan's Case, 62 Fed. Rep. 803:* "The employes of the receiver have the right to organize into or join a labor union which would take action as to the terms of their employment. The officers they appoint or any other person they choose to listen to may advise them as to the proper course to be taken in regard to their common employment, or if they choose to appoint anyone he may order them on pain of expulsion from the union peaceably to leave the employ of their employer, because any of the terms of the employment are unsatisfactory."

The act of 1883 confers no greater privileges upon these defendants than does the language of this eminent jurist, and if that act be condemned by the constitutional guarantees referred to by the learned chancellor, this pronouncement must suffer the same animadversion.

It is conceivable that substantial justice could have been effectuated in this case without entrenching upon the constitutional privileges of these defendants, for in the final analysis, says Montesquieu, "Justice is but a relation of congruity which really subsists between two things. This relation is always the same whatever being considers it; whether it be God, an angel, or, lastly, a man." *Spirit of the Law ch. 6.*

Entertaining these views, I shall vote to reverse and modify the decree accordingly.

GARRISON, J. (dissenting).

In so far as the decree appealed from directs that the defendants be enjoined from the peaceable persuasion of persons who are not under any contract to serve the complainant, I think the court below was in error, and that to that extent its decree should be reversed.

I am requested by Justice Swayze and by Judge Bogert to say that they concur in the foregoing view.

*For affirmance*—THE CHANCELLOR, CHIEF-JUSTICE, REED, TRENCHARD, PARKER, VOORHEES, VREDENBURGH, VROOM, GREEN, GRAY—10.

*For reversal*—GARRISON, SWAYZE, MINTURN, BOGERT—4.