The complainant is engaged in the leather tanning business at 241 Frelinghuysen avenue, Newark, New Jersey. This business was established about fifty years ago by Julius Lichtman, of whom the present complainant is the successor. The bill alleges, and it is not denied, that the investment of the company in its plant and business is upwards of $700,000; that it has never experienced any labor troubles until the present controversy arose and that during the last three years the plant has operated at a loss in order to keep its employes *Page 597 
at work and maintain its organization. The bill also alleges full compliance by complainant with the N.R.A. and codes applicable to the leather industry. The defendants are the Leather Workers' Industrial Union, one Flaiani and one Burt, alleged to be the business agents of the defendant union, and six former employes of the complainant company. The bill seeks an injunction against the defendants and those acting in concert with them to restrain them from unlawful interference with the complainant's business by violence, threats, intimidation, boycott, urging sympathetic strikes and picketing complainants' place of business. It is charged that the defendants have entered into a conspiracy to force the "closed shop" upon the complainants.
The bill further alleges, and the allegations are completely supported by affidavits attached thereto, that on Thursday, October 12th, 1933, at nine A.M., the defendant Bergman and others, without any previous intimation of dissatisfaction amongst the employes, presented to the president of the complainant company a written "demand" for recognition of the defendant union and the "workers' shop committee." This "demand" was typewritten and on the same paper was written in pencil: "No discrimination against any worker for belonging to any union or for being active in the shop." There was also annexed to the "demand" a "price list" in such form as to be unintelligible to the complainant or any of its officers. The "demand" was handed to the president as he was about to leave his office for business elsewhere. He informed Mr. Bergman and his associates that he would consider the matter and give them a reply on the Monday morning following. He then left his office. At eleven A.M. that same day, without any further warning, the complainant's business was stopped by someone pulling the factory whistle (the sounding of the siren being the signal for all work to stop) and the electric switches shutting off the power for the motors, and removing the fuses from the fuse boxes so that the plant was brought to a complete standstill. At that time there were large numbers of hides in vats in a perishable condition. Most of the employes immediately walked out, but many of them refused *Page 598 
to leave until they were attacked by others and forced to leave by threats of violence and a show of force. With the men who did not leave and the assistance of outside help the complainant did all it could to salvage the hides that were in the vats, but in spite of prompt action a considerable amount of damage was done. At the time the siren was blown the majority of the employes in the plant did not know that a strike was to be called. Police protection was necessary to restore order in and about the plant. The bill also alleges that a majority of the complainant's employes were willing and anxious to return to work but that they have been prevented from doing so by threats of violence and bodily harm made by defendants and their associates. It is further alleged, and it is not denied, that the defendant union is a "communistic organization not affiliated with the American Federation of Labor" and that at meetings of the employes called by the defendants copies of a newspaper known as the "Daily Worker," which is the "central organ of the Communist party, United States of America," were distributed. Since October 12th, 1933, and down to the filing of the bill of complaint the defendants have established and maintained a system of picketing complainant's works with a large force and it is alleged that these pickets and those associated with them have threatened, intimidated, annoyed and interfered with the movements of the complainant's employes, called them vile names, made threats of personal injury to them if they continued to work and have in fact committed numerous actual assaults upon some of the employes. The defendants have also distributed amongst the complainant's employes a circular, copy of which is attached to the bill of complaint and which read as follows:
 "TO ALL LEATHER WORKERS OF NEWARK The Workers of the LICHTMAN LEATHER SHOP ARE OUT ON STRIKE 100%
We are on strike under the leadership of the Leather Workers Industrial Union. We are fighting for a 25% increase in wages, 40 hour week, recognition of the Industrial Union and recognition of the shop committee. *Page 599 
The conditions in your factory are as bad as the conditions in the Lichtman shop. The cost of living is going up, up and up. Our wages are continually coming down. We cannot live on what we are getting. WE MUST FIGHT for more.
It is up to you to FIGHT for better conditions Now. What we have done, you can do!
 SUPPORT THE STRIKE OF THE LICHTMAN WORKERS! PREPARE TO STRIKE IN YOUR OWN SHOP!
 ALL LEATHER WORKERS OF NEWARK COME TO THE MASS MEETING Mon. October 16, 8 p.m. at DOELGER'S HALL 358 Morris Avenue, Newark, N.J.
To support the Lichtman strike and to discuss how we can spread the strike to other leather shops in Newark.
 GOOD SPEAKERS
Issued by Strikers of Lichtman Shop Leather Workers Industrial Union, 264 Fifteenth Ave., Newark, N.J."
The defendants have filed five answering affidavits of former employes now on strike. (It is significant that the strike leaders, Flaiani and Burt, have filed no affidavit and make no personal denial of the acts and conduct charged against them.) The answering affidavits raise a serious issue of fact in several particulars. They deny any threats, violence, intimidation or disorder. The complainant alleges that its plant has always operated on the open shop plan. This is denied by the defendants, who claim it has been operated as a closed shop, and they charge the complainant with violation of the N.R.A. and the code with respect to hours of labor and wages. They charge that the complainant refused to deal with the committee representing the employes, refused to bargain collectively, and insisted on individual negotiations. They do not deny the charge that the leather workers' union is a communistic organization and they admit picketing in large numbers. It is quite possible that the employes have some real grievances but that is a fact which, in view of the conflicting affidavits, cannot be determined except on final hearing. But these real or fancied grievances do not under present conditions justify a strike. Aimco, Inc., v.Panaswitz, docket 99, page 172 (unreported). If, as defendants claim, complainants refuse to deal with them collectively *Page 600 
through their chosen representatives, and there is some corroboration of this charge in complainant's own affidavits, it is not only their privilege but their duty to avail themselves of the facilities of the N.R.A. for the adjustment and settlement of such grievances. Aimco, Inc., v. Panaswitz, supra; BayonneTextile Corp. v. American Federation of Silk Workers, 114 N.J. Eq. 307.
This they did not do, but chose to walk out and cause the closing of complainant's plant with consequent loss to themselves, their co-workers who did not strike, and to their employers. One of the objects of the strike, as disclosed by the written demand and the circular distributed (Exhibit A, above quoted), and, I think, the main object, is to enforce the "closed shop" not only upon the complainants but also upon the entire leather industry in this vicinity. A strike to enforce the "closed shop" in complainant's factory, or, in fact, for any other purpose, under present conditions, and in view of the facilities provided by the N.R.A. for settling disputes between employers and employes, is reprehensible enough, and is undoubtedly opposed to public policy (Aimco, Inc., v.Panaswitz, supra; Elkind Sons, Inc., v. Retail Clerks'International Protective Association, 114 N.J. Eq. 586), but an attempt to cause a general strike in the leather industry, which would but multiply unemployment, with its consequent pecuniary loss and damage to both labor and capital, is more reprehensible. It is a direct interference with the administration's plan of economic recovery, cannot be too severely condemned, and should be met with vigorous and effective measures. Such a strike is for an unlawful purpose. Picketing in furtherance of that purpose is also unlawful. Elkind Sons v. Retail Clerks' InternationalProtective Association, supra.
The inevitable disorder, intimidation and violence incident to picketing in labor disputes should now, more than ever before in the history of this country, be guarded against if the herculean efforts of our chief executive toward economic recovery are to meet with any measure of success. To emphasize the inevitability of such disorder, c., where picketing is indulged in, the pungent comment of Vice-Chancellor Bergen *Page 601 
in George Jonas Glass Co. v. Glass Bottle Blowers'Association, 72 N.J. Eq. 653; affirmed, 77 N.J. Eq. 219 (at p.661), will bear repeating here. He there said:
"I give little credit to, and have no respect for, men who inaugurate a movement which they know they cannot control, and then seek to excuse themselves because they have advised, as they say, a body of men, many of them ignorant * * *, against the doing of unlawful acts when common sense and ordinary experience teaches that a body of idle workmen, called together at a common rendezvous, * * * pay no attention to moral precepts communicated for the purpose of being used as a defense when called upon to respond for the acts of a disorderly mob. If these men had been advised to return to their homes and act as orderly, law abiding citizens, simply exercising their right to quit work, a different situation would have been presented, but, on the contrary, they were gathered * * * for no possible reason except to make a show of force, the known effect of which would be to arouse the fears of others desiring to remain at work, or to take the places of those who had left, and whose continued employment would endanger the success of the result sought to be accomplished. * * *
"* * * Men have a right to cease work whenever they choose, with or without a reason. If they violate a contract the master has his legal remedy in damages, and so long as workmen abandoning work disperse and behave as quiet orderly citizens they are only exercising their rights, but when by force or intimidation they undertake to deter those who are willing to work from so doing, they violate the law of the land.
"`Picketing' in its mildest form * * * is a nuisance, and to compel a manufacturer to have the natural flow of labor to his employment sifted by a self-constituted antagonistic committee, whose very presence upon the highway for such purpose is deterrent, is just as destructive of his property as is a boycott which prevents the sale of his product."
The admitted picketing in the instant case is in such force as to be necessarily intimidating, and is violative of the complainant's *Page 602 
property rights guaranteed by the constitution of this state. Article 1, placitum 1. Defendants claim such picketing is entirely peaceful in character, unharmful, and therefore legal, but "peaceful picketing" is a contradiction in terms. AmericanSteel Foundries v. Tri-City Central Trades Council,257 U.S. 184; 66 L.Ed. 189; Truax v. Corrigan, 257 U.S. 312;11 L.Ed. 254. P.L. 1926 ch. 207 p. 348, is also invoked by defendants in justification of the picketing complained of. That act does not in terms purport to legalize picketing nor is the intention to do so apparent. Elkind Sons v. Retail Clerks' InternationalProtective Association, supra. The defendants have a perfect right to refuse to work for complainants "whenever they choose, with or without reason" (George Jonas Glass Co. v. GlassBottle Blowers' Association, supra), but they have no right to congregate about complainant's plant either in the guise of picketing or otherwise in such numbers as to intimidate or unlawfully interfere with the complainant's business. To do so creates a private nuisance which the legislature is powerless to legalize. Elkind Sons v. Retail Clerks' InternationalProtective Association, supra.
The defendants' affidavits are couched in dignified and moderate language, quite in contrast to the activities of the affiants as charged by the bill of complaint and supporting affidavits, and quite in contrast also to the attitude of the defendants, or at least of their supporters, toward the court during its consideration of this cause as is evidenced by three telegrams and a letter addressed to the court pending the return of the order to show cause and of which the following is a fair sample:
"Newark, N.J. Nov. 13, 1933 Vice Chancellor Buchanan 1060 Broad St. Newark, N.J.
We, the representatives of 14 organizations unions fraternal culture and defense protest against the injunctions issued against the Leather Workers Industrial Union. We demand the waiving of this injunction and the withdrawal of contempt charges against those workers involved.
1155P Sec. Anti Injunction Conference Stone." *Page 603 
The communications purport to represent the views of labor organizations in New Jersey, Rhode Island and Pennsylvania, and are suggestive of a prearranged plan to intimidate the court in its consideration of this cause. They are clearly contemptuous. The circumstance is alluded to only for the purpose of indicating the militant attitude of the leaders behind this strike and the necessity for drastic action if law and order are to prevail over mob rule. The processes of this court have always been as available to labor as to capital; to the poor, as to the rich; and to the weak, as to the strong. They will remain so; but the court refuses to be intimidated by any person or association, however powerful. The independence of the judiciary must be maintained at all costs. When it fails, organized government will collapse. "The judicial department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience? * * * I have always thought, from my earliest youth until now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and sinning people, was an ignorant, a corrupt, or a dependent judiciary." Chief-Justice Marshall — Debates ofVirginia State Convention of 1829-1830, pp. 616, 619.
The restraint imposed by the order to show cause herein is in no sense too broad and it will be continued pending final hearing. *Page 604