The complainant is engaged in printing amusement, transportation, clothing and other tickets at 50 Grafton avenue, Newark, New Jersey. Its plant and equipment have a value of approximately $250,000 and it does a gross annual business of approximately $300,000. Prior to May 5th, 1937, it had more than sixty persons employed at its plant and on that day a strike of the employes was called by individual defendants representing defendant labor unions, and a large majority of complainant's employes walked out. All of the defendants have participated in the strike activities.
Various acts of intimidation and violence are alleged in the bill of complaint and are amply supported by affidavits. The most outstanding of these acts of violence resulted in one of the complainant's trucks loaded with paper being driven into the Passaic river with consequent serious loss. The defendants uniformly deny any participation in any of the alleged acts of intimidation and violence and claim that the truck in question was overloaded and being driven in violation of law. The defendants Wendrich and Moser admit telephoning the state motor vehicle department, the police department of Newark, an inspector of motor vehicles and the department of weights and measures complaining that the truck was overloaded. Such concern on the part of these defendants touching a violation of the Motor Vehicle act might, under other circumstances, be highly commendable; but here their object was not enforcement of the law but interference with complainant's business. Moser rather naively suggests that the drivers, Hall and Dockx (who had tried without success to escape complainant's striking employes and were finally cornered at the Pennsylvania Railroad freight station, where they left the truck to avoid alleged attempted violence of the strikers), drove the truck into the Passaic river and there abandoned it. It is admitted on behalf of the defendants that complainant's plant has been picketed continuously since the strike was called, although the proofs as to the number of pickets on duty at any one time vary. As to the defendant's participation in the numerous acts of intimidation and violence *Page 224 
it may be said, as was said in Bayonne Textile Corp. v.American Federation of Silk Workers, 116 N.J. Eq. 146 (at p.165), "the unlawful acts were done in defendants' behalf, and for their benefit and in aid of the strike promoted by them."
As to the picketing of complainant's plant which defendants seek to justify under the provisions of chapter 207, P.L. 1926p. 348, it is clear that it should be enjoined. The primary object of the strike is the closed shop and hence unlawful. Defendants' affiants stress the fact that the main purpose of the strike is to compel the complainant to abandon the open shop plan heretofore in vogue and adopt the closed shop plan. Three objects of the strike are stated in defendants' affidavits — higher wages, recognition of the union (whatever that may mean) and the closed shop; but it is insisted by several of the union leaders in their affidavits that the strike will be continued until theclosed shop is accomplished. The complainant has already offered concessions with respect to wages and hours of work and has consented to negotiate with the unions with respect to all matters in controversy except the closed shop. The defendants have refused this offer and insist as a condition precedent to any negotiations that the complainant sign a contract providing for the closed shop. In the very recent case of Jordan's WearingApparel, Inc., v. Retail Sales Clerks Union, c., (unreported), Vice-Chancellor Stein remarked: "And here we pause to say that an employer cannot be compelled under existing law to enter into contract with any union."
And it seems strange that at this late day it should be necessary to repeat that a strike which has as its object the "closed shop" is unlawful, and that a contract providing for the closed shop is illegal and unenforceable. "The illegality of such contracts is pronounced upon the fundamental principles of our theory of government, to which monopolies of any kind affecting in any way the utmost freedom of the individual to pursue his lawful trade or business are abhorent." Baldwin Lumber Co. v.Local No. 560, Interternational Brotherhood of Teamsters,Chauffeurs, Stablemen *Page 225 and Helpers of America, 91 N.J. Eq. 240, 248. In LehighStructural Steel Co. v. Atlantic Smelting and Refining Works,92 N.J. Eq. 131, the late Vice-Chancellor Backes (at p. 136), said:
"The principle of the closed shop — i.e., the monopolization of the labor market, has found no judicial sponsor. In whatever form organized labor has asserted it, whether to the injury of the employer, or to labor or to labor unions outside the fold, the judiciary of the country has responded, uniformly, that it is inimical to the freedom of individual pursuit guaranteed by the fundamental law of the land and contravenes public policy."
In Aimco, Inc., v. Paneswitz (docket 99, page 172, 1933, unreported), Vice-Chancellor Buchanan said:
"That purpose [the closed shop] has been repeatedly denounced as unlawful not only by the courts of this state, but also by the Supreme Court of the United States and the courts of practically every other state in the union where the question has ben considered."
And see Elkind Sons, Inc., v. Retail Clerks InternationalProtective Association, 114 N.J. Eq. 586; J. Lichtman Sons v.Leather Workers Industrial Union, 114 N.J. Eq. 596; Wasilewski
v. Bakers Union, Local No. 64, 118 N.J. Eq. 349.
The object of the strike being unlawful all acts in support thereof, including picketing, are also unlawful. Bayonne TextileCo. v. American Federation of Silk Workers, supra (at p.161); Elkind Sons v. Retail Clerks International ProtectiveAssociation, supra; Dorchy v. Kansas, 272 U.S. 306, 311;71 L.Ed. 248, 269; Toledo, Ann Arbor and North Michigan Railway Co.
v. Pennsylvania Co., 54 Fed. Rep. 730, 737; 19 L.R.A. 387. InSenn v. Tile Layers Protection Union (U.S.), 81 L.Ed. 829
(at p. 839), Mr. Justice Butler said:
"But strikes or peaceful picketing for unlawful purposes are beyond any lawful sanction. The object being unlawful, the means and end are alike condemned." *Page 226 
Counsel for defendants cites the recent decision of the supreme court of the United States in Senn v. Tile Layers ProtectionUnion, supra, in support of his contention that the picketing activities engaged in by the defendants are lawful under chapter 207, P.L. 1926 p. 348; but the case is not applicable and does not express the law of this state. It involved the construction of certain sections of the Labor code of the State of Wisconsin, one of which provided that "Peaceful picketing or patrolling, whether engaged in singly or in numbers, shall be legal." This decision goes no further than to hold that a statute of the State of Wisconsin, which the highest court of that state had held to justify certain acts of the defendant union, was not in contravention of the fourteenth amendment to our federal constitution. It upheld the right of the state legislature to express by statute the public policy of that state in connection with labor disputes. If the decision had the effect claimed for it by defendants' counsel and was expressive of a federal or national public policy — if the law of Wisconsin were the law of the land — then would the guaranties of personal and property rights under our fundamental law be secured by a veritable "rope of sand." Gulf, Colorado and Santa Fe Railway Co. v. Ellis,165 U.S. 150, 154. But fortunately it is not the law of the land. Yick Wo v. Hopkins, 118 U.S. 356; 30 L.Ed. 220; Meyer
v. Nebraska, 262 U.S. 390, 399; 67 L.Ed. 1042, 1045; ButchersUnion, c., v. Crescent City Livestock Landing andSlaughterhouse Co., 111 U.S. 746, 766; 28 L.Ed. 585, 588;Coppage v. Kansas, 236 U.S. 1, 14; 59 L.Ed. 441, 446; Truax v.Raich, 239 U.S. 33; 60 L.Ed. 131, 135; New State Ice Co. v.Liebmann, 285 U.S. 262, 278; 76 L.Ed. 747, 753; nor of the State of New Jersey, Brennan v. United Hatters, c.,73 N.J. Law 729; Snead Co. v. Local No. 7, International Molders'Union, 103 N.J. Eq. 332; Feller v. Local No. 144, InternationalLadies Garment Workers Union, 121 N.J. Eq. 452. A mere recital of the facts of the Senn Case and a reference to a recent decision of our court of last resort will indicate conclusively that the law of Wisconsin as determined in that case is not the law of New Jersey. *Page 227 
Senn was engaged in performing small tile laying jobs, personally performing almost half of the manual labor required, and usually employing a tile setter and helper, occasionally two of each. Neither he nor any of his workmen were members of the union. Though a competent mechanic in that trade, he was excluded from membership because he took contracts and because he had not served the apprenticeship required by the union rules. In 1935 he had about forty jobs. His net income was $1,500, of which $750 was attributed to his own labor. The balance, constituting his profit as contractor, was not enough to support him and his family. The defendant attempted to induce Senn to adopt the closed shop in his business and put in force the union scale of wages. This he was willing to do but the union further demanded that he sign a contract in which he would agree not to work with his own hands on his own contracts. This he refused to do, although he assured the union that when his business was sufficient to justify it, he would refrain from manual labor, and explained that without personally working he could not continue in business. Conceding the truth of that statement, the union nevertheless persistently declined to modify its demands. In this posture of affairs the union began picketing Senn's place of business and engaged in various other activities designed to prevent him from securing any tile laying contracts. He sought an injunction in the Wisconsin courts which was denied, the highest court of that state holding that the controversy between Senn and the union was a labor dispute within the meaning of the Wisconsin statute, and that both the means employed and the end sought by the unions were legal under its law. But neither would be legal under the law of this state. Feller v. Local No. 144,International Ladies Garment Workers Union, supra. The extent of the decision of the United States supreme court is indicated by the following excerpts from the majority opinion:
"The judgment of the highest court of the state establishes that both the means employed and the end sought by the unions are legal under its law. The question for our determination *Page 228 
is whether either the means or the end sought is forbidden by the federal constitution.
"Clearly, the means which the statute authorizes — picketing and publicity — are not prohibited by the fourteenth amendment. Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the federal constitution. The state may, in the exercise of its police powers regulate the methods and means of publicity as well as the use of the public streets. * * *
"The laws of Wisconsin, as declared by its highest court, permit unions to endeavor to induce an employer, when unionizing his shop, to agree to refrain from working with his own hands — so to endeavor although none of his employes is a member of the union. Whether it was wise for the state to permit the unions todo so is a question of its public policy, not our concern. Thefourteenth amendment does not prohibit it." (Italics mine.)
A comparison of this language of the United States supreme court with excerpts from previous decisions of the same court as quoted in the dissenting opinion presents an interesting problem of reconciliation.
And it is a far cry from that language back to Coeur D'AleneConsolidated and Mining Co. v. Miners Union, 51 Fed. Rep. 260, where Mr. Justice Beatty said:
"Whatever enthusiasts may hope for, in this country every owner of property may work it as he will, by whom he pleases, at such wages, and upon such terms as he can make; and every laborer may work or not, as he sees fit, for whom, and at such wages as he pleases; and neither can dictate to the other how he shall use his own, whether of property, time or skill."
That high-sounding phrase was written in 1892, forty-five years ago. And while the principles of liberty underlying our fundamental law are still the same, we have gone far since those words were written. The boasted liberty of the citizen and the vaunted security of individual property are no longer what they were. Both employer and employe now dictate to *Page 229 
each other "how he shall use his own, whether of property, time or skill." We have become group conscious; are ruled in both business and government by groups and blocs, and organization has been met by organization. It is a question of the survival of the fittest.
But, however obnoxious the statement may be to some individuals or classes, it must be admitted that we are a capitalistic nation whose wealth has been built up upon the concept of property and individual right therein. So long as we continue to be a capitalistic nation and individual rights in property are recognized by the fundamental law of the land, protection to those rights must be given by our courts if government and law and order are to continue to exist. Individualism is still recognized and protected by our fundamental law and the "equality" of Bellamy has not yet been accomplished, however desirable for the social well-being it might be. Under our basic law property rights are entitled to the same protection as personal rights. The right of the individual to work at his chosen occupation is both a personal and a property right, and, as such, constitutes his capital as truly as does the money with which his employer creates an industry, and while "neither the rights nor the duties of a person are affected by being placed in the class of either laborer or capitalist" (The Law Relating toTrade Unions, by Sir William Erle, IX), to that extent both employer and employe are capitalists. But the capital of one is useless without the other, and the destruction of the one will spell the annihilation of the other. The capital of both should be used in co-operation to enhance the value of each, but this cannot be done in a foment of discord. It cannot be accomplished by violent physical attacks of the one upon the other. The tactics pursued by the defendants in support of their strike activities are the natural outgrowth of the so-called liberalism of some of our courts in labor disputes, a policy which will eventually bring its own retribution — the inevitable consequences of intimidation, violence, threats of violence and the general disregard of the rights of others incident to mob rule — the product of mob psychology. Too often the ear of *Page 230 
the court is tuned to the voice of the mob rather than to that of reason. By tolerant and temporizing decisions liberty is constantly being judicially lost — within less than half a decade last past more constitutional rights have been sacrificed by supine, tolerant and vacillating authority than can be regained by a century of reaction. But it has been well said that "there is a point where tolerance shades into weakness" and clearly this is no time for vague temporizing with law-breakers or vacillation of judicial authority.
A comparison of chapter 207, P.L. 1926, with the Wisconsin statute will show a wide difference in their respective terms. The Wisconsin act is much broader than ours. In fact, our act does not in terms legalize picketing at all. What it does authorize is "peaceably and without threats or intimidationbeing upon any public street or highway or thoroughfare forthe purpose of obtaining or communicating information." When picketing is sought to be justified under this act, the purpose
for which persons are to be unrestrained in "being upon" the public streets must be borne in mind and the act interpreted in the light of the comment of Chief-Justice Taft in the Tri-CityCase, post, that:
"We are a social people, and the accosting by one of another in an inoffensive way, and an offer by one to communicate and discuss information with a view to influencing the other's action, are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging, become an unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this the person sought to be influenced has a right to be free, and his employer has a right to have him free."
And while in Bayonne Textile Corp. v. American Federation ofSilk Workers, supra, it was said that "picketing is not per se
unlawful" but that "it is lawful if it does not have an immediate tendency to intimidation — or to obstruct free passage such as the streets afford" it was held that the picketing in that controversy was accompanied by illegal acts and that such unlawful conduct should be enjoined. In view of *Page 231 
the constitutional guaranty of the right of free speech there is perhaps no necessity for legislative action to legalize peaceful picketing, if there is any such thing; but it is rarely that a case arises where picketing is free from unlawful conduct justifying an injunction because "picketing in its mildest form" is said to be a "nuisance." George Jonas Glass Co. v. GlassBottle Blowers Association, 72 N.J. Eq. 653; affirmed, 77 N.J. Eq. 219;
"peaceful picketing" is a contradiction in terms;Truax v. Corrigan, 257 U.S. 312; 66 L.Ed. 254; American SteelFoundries v. Tri-City, c., Council, 257 U.S. 184;66 L.Ed. 189; "picketing is a pretense for persuasion, but it is intended for intimidation;" Union Pacific Railroad Co. v. Ruef,120 Fed. Rep. 102; and is usually participated in by such large numbers of strikers and sympathizers as to be impossible of control. It may, of course, be legal or illegal according to its purpose or the manner of its conduct, and this without regard to statute, the question being one of fact to be determined according to the circumstances of each particular case. Gevas
v. Greek Restaurant Workers' Club, 99 N.J. Eq. 770, 778,, and cases there cited. Assuming that in a given case picketing may be peaceful and therefore lawful, it must, of course, be carried on with due regard to the rights of others and particularly to the right of the employer to remain unmolested in the lawful conduct of his business, and the right of the public to be unrestrained and unhampered in its lawful dealings with such employer.
Lest we forget, these propositions may be considered as firmly established by the decisions of the courts of this state:
Employes, whether members of a labor union or not, have a right to strike and to use all lawful means in support of such strike and for the attainment of the lawful objects thereof; but the right is relative and in exercising it strikers must have due regard to the rights of others. And the right to strike does not mean the right to strike with clubs, stones or other weapons. A legal strike is a peaceable walkout, the voluntary cessation of the striker's employment, in which the employer and those desiring to remain in its employ are left free to continue the operation of the business in a lawful *Page 232 
manner, and the pursuit of their lawful employment unmolested. Whenever in the conduct of a strike illegal means are used in support thereof, such as intimidation, threats and violence, the strike itself becomes unlawful; at least until those illegal acts are discontinued.
The right of the citizen to work at his chosen lawful occupation must remain inviolate.
An employer has the right to run his business on the open shop plan if he desires to do so. He cannot be compelled to adopt the closed shop plan against his will.
Such of the employes as are satisfied with their employment have a right to continue that employment unmolested by other employes who are dissatisfied and by others acting in concert with them.
The employer has a property right in the services of his employe not to be infringed by outside interference. There is a corresponding right in the employe to be protected in the exercise of his right to work.
At common law every person has individually, and the public also have collectively, a right to require that the course of trade should be kept free from unreasonable obstruction. Restraint of the free course of trade in labor controversies by acts of molestation or obstruction, which are not otherwise unlawful, but which operate as a hindrance to the exercise of a trade, and which are done for the purpose of such hindrance without justification, constitute an actionable wrong. Erle,Trade Unions 6, 20.
These rights are fundamental, and, except as modified, are guaranteed by our basic law. They must all remain inviolate, otherwise law and order will succumb to anarchy. *Page 233