Complainant's bill prays that defendants, District No. 47 of the International Association of Machinists, and others, be enjoined from intimidating complainant's employes, or picketing its factory, and from taking any steps to induce its employes to refrain from working, or from doing any acts in furtherance of the strike now existing against complainant. The cause is before me on the return of an order to show cause why such an injunction should not go pending final hearing.
The order to show cause embodies interim restraint, relating to the manner of picketing, granted after hearing answering affidavits and argument on two days' notice, pursuant to chancery rule 212. Counsel for complainant expresses the view that the interim restraint should be continued as of course and that the only matter for inquiry is whether additional restraints should now be imposed. Clearly that is unsound. Such affidavits and argument as may be presented on the two days' notice are a guide to the court on one question only — whether the defendant should be restrained until the return of the order to show cause. Upon the return of the order, the whole question of an injunction is open, unprejudiced either by the granting or the denial of interim restraint.
Picketing and other strike activities may be unlawful because of the manner in which they are conducted or because of the object sought by the strikers. Complainant charges that the pickets have threatened and even assaulted its employes. The proofs mention only one instance of violence, a fracas between an employe and a picket, but there it clearly appears that the employe was the assailant. The alleged threats are all specifically denied. *Page 276 
It is, however, undisputed that the picket line consisted of twenty-five or so pickets, who marched back and forth before the factory entrance, in close formation and not at intervals of ten paces. Intervals of ten paces are mentioned in Rev. Stat.2:29-77, formerly P.L. 1926 p. 348. Counsel for defendant urges that the statute does not make unlawful the parade of pickets at less than ten paces apart.
In form, the statute is a restriction on the power of the court of chancery and as such it is plainly unconstitutional. This court, in granting an injunction in a labor controversy — as in many other cases — proceeds on a finding that the defendants are guilty of a tort against complainant, for which the courts of law afford no adequate remedy. The injured party has a right to relief in equity against such a wrong, and the court is bound to aid him. The power of the court is secured by our constitution against impairment by the legislature. Traphagen v. WestHoboken, 39 N.J. Law 232; 40 N.J. Law 193; Flanigan v.Guggenheim Smelting Co., 63 N.J. Law 647; In re PrudentialInsurance Co., 82 N.J. Eq. 335.
But our substantive law of torts is not unchangeable, like the law of the Medes and the Persians. Over it the legislature has considerable power and the statute — or some portion of it — may be sustained by considering it to be in fact, though not in form, a declaration that certain acts are not tortious. This view is implicit in a number of our cases. Gevas v. Greek RestaurantWorkers' Club, 99 N.J. Eq. 770; Bayer v. Brotherhood ofPainters, c., 108 N.J. Eq. 257; Elkind Sons, Inc., v. RetailClubs, c., Assn., 114 N.J. Eq. 586; Restful Slipper Co., Inc.,
v. United, c., Union, 116 N.J. Eq. 521; Cameron v.International, c., Union No. 384, 118 N.J. Eq. 11; Feller v.Local 144, c., 121 N.J. Eq. 452; International Ticket Co. v.Wendrich, 122 N.J. Eq. 222. Whether the statute, thus construed, makes any changes in, or is declaratory of, the common law is another question. Vice-Chancellor Berry in the ElkindCase held that it was merely declaratory; Mr. Justice Lloyd in the Feller Case speaks of it as modifying the common law. But I know of no case in which the result would probably have been different if the statute had not been enacted. *Page 277 
The statute has nothing to do with the object of the picketing but only with the manner thereof. The authorities above cited demonstrate that if the object is unjustifiable, the picketing is unlawful, even though carried on in the manner described in the statute. The statute may be taken to enact that it is not unlawful — not a tort — for persons to picket peaceably, "provided such persons remain separated from each other at intervals of ten paces or more." Does the statute make peaceable picketing unlawful where the pickets are closer to each other than ten paces? I think not. Neither does it legalize such picketing; it does not deal with that situation. The common law governs. I use the term "picketing" despite its militant flavor, and although it is not found in the statute, because it has a well recognized secondary meaning in labor controversies.
The common law secures to complainant free and unobstructed access to and from its factory. Certainly a line of twenty-five men marching up and down in close formation before the entrance obstructs access to the factory and is unlawful. The pickets will be required to keep intervals of ten paces. Moreover, so large a number as twenty-five in itself may intimidate and lead to trouble. Half a dozen are ample.
The principal question argued is whether all picketing and strike activities should be enjoined. Complainant says that the strike is unlawful in that its whole purpose is to induce complainant to do certain acts forbidden by the National Labor Relations act. 49 Stat. 449; 29 U.S.C.A. 151 et seq. The parties agree that complainant's business has sufficient interstate character so that the statute governs its labor relations.
Complainant, on July 14th, 1937, entered into contract with defendant union, fixing wages, hours and working conditions of its machinists and production workers for a period of one year, and providing that all the employes in these classifications must be members of the union. Prior to the expiration of the contract, representatives of complainant and of the union began negotiations for a new contract. Disagreement *Page 278 
cropped up about closed shop, seniority rights and vacation with pay. At the last of the conferences, it was agreed that complainant would draft a clause on seniority rights and that then a further meeting would be held, but before the time arrived for the adjourned conference, namely, on August 18th, a committee of complainant's employes informed complainant that a majority of the employes had resigned from the union and had selected their own committee for the purpose of collective bargaining.
The next day, complainant's representatives met the union officers and told them what they had heard from the employes' committee and stated that complainant was desirous of bargaining collectively and to that end needed only definite knowledge as to which of the two groups of alleged representatives of employes was, in fact, authorized to act, and complainant offered to agree to any reasonable method of ascertaining that fact. The agent of the union still insisted that the company proceed to settle the contract terms in dispute. But complainant refused to continue the negotiations. On August 29th, the union's counsel telephoned to counsel for the complainant to demand a further conference in order to conclude the negotiations. He replied: "The company wishes to have the question of representation definitely settled before it will proceed to bargain." That same day, such of complainant's employes as still adhered to the union, went on strike, picketing began and in a few days complainant shut down its factory.
The National Labor Relations act, section 8(3) declares it to be an unfair labor practice for an employer, by discrimination in regard to hire or tenure of employment, to encourage or discourage membership in any labor organization, provided that this shall not preclude an employer from making an agreement with a labor organization requiring membership therein as a condition of employment, if such labor organization is the representative of the employes as provided in section 9(a).
Section 9(a): *Page 279 
"Representatives designated or selected for the purpose of collective bargaining by the majority of the employes, in a unit appropriate for such purpose, shall be the exclusive representatives of all the employes in such unit for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment; provided, that any individual employe or group of employes shall have the right at any time to present grievances to their employer."
These provisions of the statute, in my opinion, make it unlawful for an employer (whose business substantially affects interstate commerce) to enter into a closed shop contract except with a union which is the representative selected for bargaining purposes by a majority of the employes. Not unlawful in the sense that any individual is given a right of action on the statute, but unlawful in the sense of contrary to the policy of the United States as determined by Congress. A strike and picketing, intended to induce the employer to engage in "an unfair labor practice" as defined by Congress, or to act contrary to the policy of the United States, are unlawful under the law of New Jersey because they have an unlawful purpose.
Complainant asserts that it was unable to determine the fact whether or not the union in August represented the majority of the employes; that it had notice which it could not safely disregard that the union was not such representative. The affidavits bear out complainant. Complainant, after hearing from the committee of employes on August 18th, could not properly agree to employ only members of the union. But it does not appear that the strike grows out of a refusal of complainant to contract for a closed shop or that the object of the strike is such a contract. The strike resulted from the refusal of complainant to continue negotiations; the purpose of the strike seems to be to persuade complainant to resume the bargaining process. If negotiations were renewed, the union might recognize that complainant could not agree to hire only union men until the question of majority representation should be determined.
But complainant further says that it was forbidden by the statute from continuing the negotiations and in support it *Page 280 
points to section 8(3) which names as another unfair labor practice the refusal of an employer "to bargain collectively with the representatives of his employes, subject to the provisions of section 9(a)." Section 9(a), above quoted in full, makes the majority representatives, "the exclusive representatives of all the employes" for the purpose of collective bargaining. When representatives have been chosen by the majority, the statute impliedly forbids negotiations of labor contracts with anyone else. National Labor Relations Board v. Jones Laughlin,301 U.S. 1; 57 S.Ct. 615. But what, if no representatives have been chosen? What if the employer cannot find out who represents the majority of his men?
"If there is a dispute between different groups of employes as to what organization of their own choosing should represent them, the [National Labor Relations] Board has authority, and it is its duty to designate the bargaining agent." Peninsular, c., Co.
v. National Labor Relations Board (5 Cir.) 98 Fed. Rep.
2d 411. Complainant has not asked the board to take cognizance of the dispute because the board, says complainant, always refuses to act unless petitioned by employes or labor unions. Neither the defendant union nor the employes' committee has been certified by the board to be the majority bargaining representative. In the absence of such certification, an employer cannot shut his eyes to other evidence showing clearly who represents the majority. National Labor Relations Board v.Remington Rand (2 Cir.) 94 Fed. Rep. 2d 862. But in the instant case, complainant and defendant agree that there is no such evidence. In this state of doubt, did Congress intend that an employer must refrain from bargaining with either or both sets of putative representatives?
Before the day of the statute, employers had, of course, the right to discuss with groups of their employes, wages, hours of employment, c. Employers could use the information so obtained in making up their minds what terms to offer to their men; they could embody their conclusions in agreements. In the great majority of factories throughout the land, there was, when Congress acted, no labor union or other *Page 281 
organization of workmen representing a majority of the employes. Congress probably hoped by the enactment, to foster the growth of labor unions and anticipated that in most industrial units engaged in interstate commerce, a majority of the employes would unite in choosing some one labor union as their representative. When a majority of the employes do so, that union becomes the exclusive representative of all the employes for the purpose of collective bargaining. But no congressional intention can be discovered in the statute that when a majority of the employee have not, in fact, selected a bargaining representative, the employer shall refrain from ascertaining by conference — by "bargaining" — the wishes of different groups of his employes.
Provisions of the Railway Labor act (45 U.S.C.A. § 152), analogous to section 9(a) of the Labor Relations act, were under consideration of the supreme court in Virginia Railway Co. v.System Federation, 300 U.S. 515; 57 S.Ct. 392. The court quoted (note 6) the interpretation advanced by the then solicitor general (now Mr. Justice Reed): "If a majority of a craft or class has not selected a representative, the carrier is free to make with anyone it pleases and for any group it pleases, contracts establishing rates of pay, rules or working conditions." While the court did not have occasion to deal with this particular matter, the opinion of the solicitor general has much weight.
One more step reaches the situation before me: Rival claimants to the title of majority representative; and fair doubt whose claim is valid. Congress anticipated the case and empowered the board to decide the issue. In the meantime, during the weeks or months that may elapse before the board is asked to act, or before it reaches a decision, and so long as there remains fair doubt who is the majority representative, the employer may, I believe, lawfully negotiate with anyone willing to confer. Congress aimed to promote and not to prevent collective bargaining. Employes who consider themselves prejudiced by the bargaining may appeal to the board, and the board may not only conduct an election but, before the election, may make other dispositions in order *Page 282 
to avoid employer domination of the election. A case of that character was National Labor Relations Board v. Penn GreyhoundLines, 303 U.S. 261; 58 S.Ct. 571. The board ordered the company to withdraw all recognition from a company union as representative of their employes. The circuit court of appeals (3 Cir.), 91 Fed. Rep. 2d 178, held the order improper since no election had been held to choose a bargaining agent. The supreme court reversed on the ground that the evidence supported the board's finding that recognition of the company union was in itself a continuing obstacle to the exercise of the employes' right of collective bargaining. But the court added, "we may assume that there are situations in which the board would not be warranted in concluding that there was any occasion for withdrawal of employer recognition of an existing union before an election by employes under section 9(c)."
In Consolidated Edison Co. v. National Labor RelationsBoard (2 Cir.), 93 Fed. Rep. 2d 390, the court enforced an order of the board which restrained the employer from recognizing a certain union as exclusive bargaining agent, and at the same time permitted the employer to contract with the union in terms which recognized it as the representative of its members and was applicable only to such members. This, said the court, seemed to be entirely lawful.
Still another provision of the statute enters into the argument: Section 13. "Nothing in this act shall be construed so as to interfere with, or impede, or diminish in any way, the right to strike."
Each party to a labor controversy is left by the statute to use its own economic strength in all lawful ways to promote its advantage. In Black Diamond S.S. Corp. v. National LaborRelations Board (2 Cir.) 94 Fed. Rep. 2d 875, while an election was being held by the board to determine which of two rival unions represented a majority of the men, one of the unions demanded that the company bargain with it. The demand was ignored and the union called a strike. The court held that the men had a right to strike and that the strike did not prejudice their position under the statute. *Page 283 
See, also, National Labor Relations Board v. Mackay Radio andTelegraph Co., 304 U.S. 333; 58 S.Ct. 904.
 Lund v. Woodenware Workers' Union, 19 F. Supp. 607, was a suit by an employer for injunction against a minority union. The district court said that Congress "did not intend to limit in any way the actions of the minority in protesting against the agreements of the majority and generally in taking legal measures by strike to achieve redress of alleged grievances." And again, that nothing in the statute "makes it illegal for a minority to strike and to seek thereby to obtain sufficient strength so as to become the sole bargaining agency." The weight of this opinion is increased by the approval given it in Blackenship v. Kurfman
(7 Cir.), 96 Fed. Rep. 2d 450.
 Oberman v. Garment Workers Union, 21 F. Supp. 20, holds that once the board has certified the bargaining representative, a strike by a minority union to force the employer to bargain with it is unlawful. The court distinguished the Lund Case
because there the board had not designated the bargaining agent.
The purpose of the statute is the avoidance of interruptions to commerce arising from labor disputes, and the method prescribed is collective bargaining. In my opinion, complainant was not required by the statute to break off negotiations with defendant union; the object of the strike, namely, resumption of negotiations, is not unlawful.
There will be an injunction limiting the number of pickets, and prescribing the intervals they shall keep. Application for more extensive injunction denied. No costs to either side. *Page 284