The bill is for an injunction restraining the defendants from continuing the picketing of complainant's place of business, and enjoining certain other activities usually accompanying a labor dispute. *Page 585 
The complainant owns and operates a lunch wagon or "diner" on Poinier street, Newark, New Jersey. The entire capital stock of the complainant company is owned by Anthony J. Schneider, the vice-president of the company, who works in and manages the "diner," and William J. Jernick, who is president of the company. The lunch wagon is located on leased land which has a frontage of only seventeen feet on Poinier street. The lease for this land expires June 1st, 1939. The three individual defendants were, up to October 11th, 1938, the only employes of complainant. The defendant Bukowski, was the cook; the defendants Day and Rich, countermen; and they are all members of the defendant union. So far as the proofs show none of them ever expressed to their employer any dissatisfaction with their wages or hours of employment; but, without making any attempt to bargain with the complainant, or any demand for higher wages, or shorter hours, although one of the owners was their co-worker in the same room with them, and the other owner was available, they asked Mr. Longo, the business agent of the defendant local, to negotiate with their employer for them. For several weeks the business agent negotiated with complainant, but ultimate result was negative. The demands were for higher wages, shorter hours and a "closed shop" agreement which was to provide, inter alia, for the employment of additional help. Upon complainant's refusal to enter into a closed shop agreement, and increase the wages of its employes, the business agent went to the "diner" and instructed the employes to go out "on strike." They quit work immediately and walked out. Picketing was immediately begun — the complainant says by four pickets carrying signs — but, according to the defendants, by only two, later reduced to one. It is a fact, however, that at times a considerable number of persons, the complainant claims as many as thirty, apparently sympathizers, congregated and milled around on the sidewalk in front of the "diner," and automobiles remained parked in front, and on either side, of the entrance, continually — an unusual condition plainly attributable to the strike activities. Vile language addressed to complainant's manager, by defendants, or those acting in concert *Page 586 
with them, is also charged, and complainant claims these activities have resulted in disorder, blocking of ingress and egress, and intimidation of customers and would-be customers. Complainant's affidavits fully support these charges. The average weekly receipts of the business have dropped from $400 to $70. The business is practically at a standstill, and must shut down entirely if these conditions are permitted to continue. The defendants disclaim any responsibility for any of these conditions except the picketing.
There can, of course, be no doubt about the right of complainant's employes to quit work, or "strike," as they say they have done, if they are dissatisfied with the terms of their employment; but it is equally the privilege of the employer to operate his business on the open shop plan if he desires to do so, to fix the minimum wage to be paid to his employes, and to be free from unlawful and unreasonable interference in the management of his business. International Ticket Co. v.Wendrich, 122 N.J. Eq. 222; affirmed, 123 N.J. Eq. 172; CanterSample Furniture House, Inc., v. Retail Furniture Employes'Local, c., 122 N.J. Eq. 575. Both employer and employes are entitled to the full protection of the courts in the enjoyment of their respective rights, but all social rights are relative and must be exercised by one with due regard to the rights of others.
As has been repeatedly said by the courts of this state, picketing may be lawful or unlawful according to the circumstances of each particular case, and ordinarily the presence of one picket in the vicinity of an employer's place of business, a strike being in progress, would not be objectionable providing the presence of that picket did not prompt or conducted with restraint, results in the congregation of crowds induce tortious acts. Generally, however, picketing, unless of sympathizers, and crowds almost invariably result in more or less disorder. The focusing of such crowds, whether of pickets, sympathizers, or mere onlookers, upon the entrance to a small business place might be unduly restrictive, or totally destructive, of an employer's right to conduct his business in a lawful manner, when, if addressed to a large business or plant, with many entrances and exits, it would *Page 587 
not be. The common law rule relating to torts, of which a nuisance may be one, usually controls. Eastwood-Nealley Corp.
v. International Association of Machinists, 124 N.J. Eq. 274.
The presence of a single picket may of itself be a nuisance, or result in the creation of a nuisance. Gevas v. GreekRestaurant Workers' Club, c., 99 N.J. Eq. 770. Haywood v.Ryan, 85 N.J. Law 116, is not contra. The only issue before the court in that case was the application of the language of a statute to the proven facts. The result of the picketing in the instant case (whether it be of one picket or by four) is the creation of a nuisance — the gathering of abnormal crowds of men and women, milling around the entrance of complainant's place of business, blocking ingress and egress — abnormal conditions resulting in disorder, conditions which would not have obtained without union sponsorship of the walkout; but which are the natural result of the union activities.
Now, it is obvious that the defendants' activities tend not only to destroy complaint's right to do business in a lawful manner, but are likely to be destructive of the business itself. Such a result benefits no one but as surely injures the complainant. It is not damnum absque injuria. The proofs show that the individual defendants' walkout, however much within their rights, was not entirely of their own volition. It was dictated and directed by the business agent of the defendant union who personally supervised the ceremony, albeit this agent was acting on behalf of the employes at their request. And this leads to the question as to the extent to which organized labor is to be permitted to control small business. The individual shopkeeper — the small business man — who employs but a half dozen men, will be entirely at the mercy of a labor organization if it is permitted to employ the same tactics against small business as it usually employs against big business — great aggregations of capital. Of course, the unionization of complainant's business, in which but three men are employed, would not be a serious blow to the open shop; but by the same token no great advantage to organized labor can result from its unionization — unless it be a step toward monopoly. From the standpoint of labor, *Page 588 
a business like complainant's is "small change;" but to the small business man, his business may, and usually does, represent his life's work, his all. Vice-Chancellor Bigelow recently had occasion to enjoin the picketing of a shoe shop whose oneemploye had gone on strike. Diamond v. United Retail, c.,Local 108 (Docket 122, page 720). The picketing in that case resulted from a refusal of the employes to bargain with the union. The practice is not locally confined, by any means. SeeSenn v. Tile Layers Protection Union (Wisconsin),81 L.Ed. 829 (United States supreme court). It does not appear, in the instant case, that it was at all necessary for these three employes, working in the same room with their employer, to enlist the services of the business agent of the defendant union in negotiating for higher wages and shorter hours; their own efforts, had they made any, might have proved more successful. The plain inference to be drawn from the circumstances is that force, economic coercion and intimidation, fear of business ruin, not argument or persuasion, was the motivating influence to be used against the employer. The employer was to be compelled to accede to the union's demands, or crushed. Against the power of the union the complainant is absolutely defenseless. He must either submit, or go out of business. An employer whose business requires the services of only three men should be entirely free to choose his employes from the open labor market, union or non-union, as he pleases. Any restriction upon that right is almost certain to be destructive of the right itself. The facts here justify that statement.
The labor union was born of necessity. However, that necessity arose, not from abuses of the small business man employing few men, but from the oppression of workmen by large combinations of capital employing such numbers of men that the individual was reduced to a mere number utterly incapable of audible vocal protest against the exactions of unscrupulous employers. Such workmen, designated each by number rather than by name, never come into contact with the employer or with anyone having authority to fix wages or to determine labor policies. And it was this condition which produced the principle of collective bargaining. It is *Page 589 
doubtful if recent statutes (not applicable here) insuring to labor the right of collective bargaining through an agency of its own choice, were ever intended to apply to such "small business" as that here involved. Cf. the New Jersey Unemployment Compensation act (R.S. 43:21-9) which is inapplicable where less than eight are employed. Rules developed in industrial conflicts between powerful employers on the one hand, and large bodies of employes on the other, have for their objective equality between employer and employe. Bayonne Textile Corp. v.American Federation of Silk Workers, 116 N.J. Eq. 146 (at p.156). "Equality is equity." The equality of bargaining power sought through collective bargaining in a business employing a large number of men becomes gross inequality when applied to small business. And these rules uniformly applied to small business may produce a result directly contrary to that for which they were designed — inequality instead of equality — inequity instead of equity. While the effect of a "strike" of three men out of a total of one hundred or one thousand employes would be negligible, a "strike" of three men who constituted the entire working personnel of a business, would bring that business to a standstill and constitute an effective protest without union intervention; unless the labor market was such that the vacant places could be promptly filled by the employer, a privilege which he should not be obliged to surrender by a show of union force and intimidation.
No definite line of demarcation between "big business" and "small business" can be drawn, and the number of employes may not always be controlling, each case being more or less a law unto itself; but oppression, whether of employer or employe, is condemned. Equitable rules designed to protect the employe may not be invoked to permit oppression of an employer. The ancient jurisdiction of the early English chancellors to protect the poor, weak, helpless and oppressed against the rich and powerful, founded upon the principle of conscience (1 Pom. 36 note), is still possessed by this court. The "rich and powerful" oppressor may be a labor union, as well as an employer, and in determining the equality of equity the wealth and strength of the union, rather than of the few *Page 590 
employes whom it represents, will be measured against that of the employer.
I think that this case is one in which the small business man is entitled to the protection of the court, to an injunction against all picketing by the defendants or persons acting in combination with them, and enjoining all activities which interfere with free ingress and egress to and from complainant's diner.